1  Todd M. Schneider (SBN 158253)
   Jason H. Kim (SBN 220279)
2  Matthew S. Weiler (SBN 236052)
   **SCHNEIDER WALLACE**
3  **COTTRELL KONECKY LLP**
4  2000 Powell Street, Suite 1400
   Emeryville, CA 94608
5  Telephone: (415) 421-7100
   TSchneider@schneiderwallace.com
6  JKim@schneiderwallace.com
   MWeiler@schneiderwallace.com
7
8  Peter D. St. Phillip (*Pro hac vice* to be filed)
   **LOWEY DANNENBERG, P.C.**
9  44 South Broadway, Suite 1100
   White Plains, NY 10601
10 Telephone: (914) 997-0500
   PStPhillip@lowey.com
11
12 [Additional counsel on signature page]

13
14          **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
15

16 HUMANA INC.,                              Case No.

17              Plaintiff,

18      vs.                                  COMPLAINT

19 JAZZ PHARMACEUTICALS, INC.;              JURY TRIAL DEMANDED
   JAZZ PHARMACEUTICALS IRELAND
20 LIMITED;
   JAZZ PHARMACEUTICALS PUBLIC
21 LIMITED COMPANY;
   HIKMA PHARMACEUTICALS PLC;
22 HIKMA PHARMACEUTICALS USA INC.;
   HIKMA LABS, INC.;
23 EUROHEALTH (USA), INC.;
   AMNEAL PHARMACEUTICALS LLC;
24 PAR PHARMACEUTICAL, INC.;
   LUPIN LTD.;
25 LUPIN PHARMACEUTICALS INC.;
   LUPIN INC.,
26
                        Defendants.
27

28              COMPLAINT
        *Humana Inc. v. Jazz Pharms., Inc., et al.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION AND VENUE ........................................................................ 4

III.  THE PARTIES ................................................................................................... 4

IV.   REGULATORY BACKGROUND ................................................................... 9

    A.   Regulatory Structure for Approval and Substitution of Generic Drugs. ........................... 9

        1.   The Prescription Drug Market Place ............................................................. 9

        2.   The Hatch-Waxman Act and FDA Approval Process. ................................. 9

        3.   Use of Authorized Generics to Maximize Profits Following Generic Entry. .............. 15

        4.   Acceleration Clauses As a "Poison Pill" to Further Generic Entry. ........................... 16

V.    DEFENDANTS' ANTICOMPETITIVE CONDUCT ................................. 17

    A.   The Development of Sodium Oxybate ........................................................... 17

    B.   Sodium Oxybate as a Treatment for Narcolepsy ......................................... 18

    C.   Jazz Obtains All Rights To Xyrem Through Orphan Medical Acquisition ..................... 20

    D.   The Xyrem Patents ......................................................................................... 21

        1.   The '431 Family Of Patents (Formulations And Methods Of Treatment) ................ 21

        2.   The '730 Family Of Patents (Drug Distribution System And Method) .................... 22

        3.   The '302 Family Of Patents (Method Of Administration) ........................................ 23

    E.   Jazz Jacks Up Xyrem Prices "to the Moon". ................................................ 23

    F.   Jazz Seeks A Multiple Pharmacy Rems In Conjunction With Its Request For Approval To Market Xyrem For Fibromyalgia ................................. 25

    G.   Generic Challengers Make Paragraph IV Certifications. ............................. 26

    H.   Jazz Files Sham Litigation to Combat Roxane's (Now Hikma's) Threat. ....................... 26

    I.   Jazz Reverses Course In Its REMS Negotiations, Discouraging Generic Entry ............. 27

    K.   The '730 Family Are Declared Invalid in Inter Partes Review. ....................................... 31

    L.   The Jazz-Hikma Reverse Payment Agreement ............................................. 32

    M.   Jazz Enters Into Unlawful Reverse Payment Agreements With Par, Lupin, And Amneal: the Later Generic Defendants ................................. 35

COMPLAINT
*Humana Inc. v. Jazz Pharms., Inc., et al.*
i

N.      The Jazz-Hikma Agreement Has Caused, And Will Continue To Cause, Anticompetitive Effects ................................................................................................ 37

VI.  DEFENDANTS' ANTICOMPETIVE EFFECTS IN THE MARKET FOR SODIUM OXYBATE ................................................................................................................. 40

VII. JAZZ'S MONOPOLY POWER ........................................................................................ 40

VIII. EFFECTS ON TRADE AND COMMERCE ..................................................................... 41

IX.  ANTITRUST INJURY ....................................................................................................... 42

X.   PLAINTIFF'S CLAIMS ARE TIMELY ............................................................................ 43

A.      Defendants Fraudulently Concealed by Omission Their Unlawful Agreements .............. 43

B.      Defendants' Continuing Violations. ................................................................................. 44

XI.  CLAIMS FOR RELIEF ...................................................................................................... 45

XII. DEMAND FOR JUDGMENT .......................................................................................... 62

XIII. JURY DEMAND ............................................................................................................. 63

1.      Plaintiff Humana Inc. ("Humana" or "Plaintiff") brings this action against Defendants Jazz Pharmaceuticals, Inc., Jazz Pharmaceuticals Ireland Limited, Jazz Pharmaceuticals Public Limited Company, Hikma Pharmaceuticals plc, Hikma Pharmaceuticals USA Inc., Hikma Labs, Inc., Eurohealth (USA), Inc., Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals Inc., and Lupin Inc., (collectively, "Defendants") for violations of antitrust, consumer protection, and common laws. Plaintiff's claims concern Defendants' scheme to restrain competition for branded Xyrem and its AB rated generic bioequivalents in the United States. Defendants, the brand manufacturer of Xyrem and several competitors, abused the patent laws for profit by allocating the market for a drug that was invented nearly 150 years ago. Sodium oxybate, sold under the brand name Xyrem (also known as γ-hydroxybutyric acid (GHB)) is a naturally occurring substance found in the central nervous system. Xyrem is manufactured by Jazz Pharmaceuticals, Inc and its affiliates ("Jazz"). Xyrem has historically been Jazz's main source of revenue, making up 70% or more of its revenues since 2007. Jazz's growth and profits have been entirely linked to its ability to increase prices on Xyrem and keep the market to itself. To prevent generic competition and unlawfully maintain this monopoly, Jazz first manipulated an FDA safety program meant to mitigate safety risks of certain drugs ("REMS"); engaged in sham patent litigation; abused the REMS process to further frustrate generic competitors; and finally agreed with other Defendants to delay generic entry in exchange for allocating the generic market for AB-rated generic Xyrem. All the while, Jazz imposed a series of grotesque price hikes that would have been impossible had generic entry been successful. This scheme caused Plaintiff to pay inflated prices for Xyrem from July 17, 2017 through the present, until the anticompetitive effects of the Defendants' unlawful conduct cease.

# I.      INTRODUCTION

2.      This litigation challenges a comprehensive anticompetitive scheme to suppress generic competition for Xyrem, a leading treatment of narcolepsy. Defendants abused an FDA drug safety program called "Risk Evaluation and Mitigation Strategy," engaged in sham patent litigation, and entered into reverse payments to generic manufacturers to preserve their monopoly in Xyrem. Through this

1  scheme Defendants suppressed generic competition and raised the price of Xyrem 841% between 2007

2  and 2014. Third-party payors such as Plaintiff footed the bill for this manipulation.

3      3.      Sodium oxybate, the active ingredient in Xyrem, is a central nervous system depressant

4  that has been widely available in the United States since the 1960s. Sodium oxybate is the chemically

5  derived version of γ-Hydroxybutyric acid (GHB), which occurs naturally in human bodies' central

6  nervous systems, as well as wine, beef, small citrus fruits, and almost all animals.[1]

7      4.      Narcolepsy is a disorder characterized by excessive daytime sleepiness ("EDS") and

8  intermittent manifestations of REM sleep during wakefulness. In 1994, the Food and Drug

9  Administration's ("FDA") Orphan Products Development Division and a non-profit advocacy

10  organization approached a small Minnesota-based drug company, Orphan Medical, to suggest the

11  development of sodium oxybate for treatment of cataplexy, which is a common symptom of narcolepsy

12  manifested by sudden episodes of bilateral skeletal muscle weakness induced by an emotional trigger

13  such as laughter, anger, embarrassment, or surprise.

14      5.      Orphan Medical began development of what would become Xyrem and, in 2002,

15  obtained FDA approval to market sodium oxybate for the treatment of cataplexy associated with

16  narcolepsy in adults. Orphan branded its product Xyrem. In 2005, Orphan Medical obtained FDA

17  approval to market Xyrem for EDS associated with narcolepsy in adults. Until 2021, Xyrem was the

18  only drug approved by the FDA to treat both EDS and cataplexy associated with narcolepsy. In 2020,

19  the FDA also approved Jazz's follow-on sodium oxybate product, Xywav, for the treatment of those

20  conditions.

21      6.      In 2005, Jazz Pharmaceuticals, Inc. acquired Orphan Medical. "The acquisition was

22  unprofitable at first .… By 2009, Jazz was on the verge of bankruptcy. … Jazz responded by replacing

23  its management team."[2] Jazz then began a series of epic price hikes. In May of 2014, Bloomberg

24  published a ranking of drug price increases from 2007 to 2014. Xyrem ranked first with an overall

25

26  [1] "Gamma-hydroxybutyric acid (GHB), Critical Review Report," World Health Organization Expert Committee on Drug Dependence (2012);

27  https://www.who.int/medicines/areas/quality_safety/4.1GHBcritical_review.pdf

28  [2] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 2 (N.D. Cal. Aug. 13, 2021).

increase of 841% from 2007 to 2014, well-ahead of notorious products such as EpiPen.[3] Overall, from 2007 to the present the price of Xyrem has increased from about $2/ml to over $31/ml, an increase of over 1000%.

7.     Jazz could only impose these gruesome price hikes on Plaintiff and other parties responsible for managing health care costs because it unlawfully maintained its monopoly in Xyrem. As Jazz's CEO admitted at a 2011 investor conference, Jazz's monopoly was central to its value proposition: "There's really no competition. The other drugs used to treat narcolepsy for the excessive daytime sleepiness part of narcolepsy are stimulants. Those can and are used together with Xyrem, so that's not an 'either/or', it's an 'and' proposition. Probably 80% to 90% of our patients and the patients in our clinical trials were also on stimulants."[4]

8.     To maintain its Xyrem monopoly, Jazz enacted a series of anticompetitive measures directed at ensuring there would be "no competition" from AB-rated generic Xyrem, the only product that could reign in Jazz's ability to profitably inflate prices.

9.     Jazz's scheme "had three main parts that operated in roughly chronological but overlapping order: (a) abuse of an FDA drug safety program called 'Risk Evaluation and Mitigation Strategy'; (b) sham litigation; and (c) reverse payments to four of the generic manufacturers."[5]

10.     The capstone to Jazz's scheme came in 2017, when it agreed with perhaps its strongest competitor, Hikma, to delay generic entry in exchange by a promise by Jazz to not launch an authorized generic. This "no AG" agreement, which was hidden from the market when it was reached in 2017, ensured Jazz would see no serious generic competition until July 2023: "on April 5, 2017, after nearly seven years of trying to bring an AB-rated generic to market, Hikma agreed to buy and relabel Xyrem rather than manufacture a generic version of Xyrem. By agreeing to this, Hikma delayed its allegedly

---

[3] "Drug Prices Soar for Top-Selling Brands," Bloomberg, May 1, 2014; https://www.bloomberg.com/graphics/infographics/drug-prices-soar-for-top-selling-brands.html.
[4] Conference Call Transcript; Jazz Pharmaceuticals, Inc. at Piper Jaffray Health Care Conference, Jazz Pharmaceuticals (Nov. 30. 2011), https://investor.jazzpharma.com/node/12191/html.
[5] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 8 (N.D. Cal. Aug. 13, 2021).

impending entry into Jazz's market over six years until at least July 1, 2023 (i.e., the end of the six month term for Hikma's AG)."[6]

11.     Plaintiff seeks damages for the overcharges it paid as a result of Defendants' conduct as well as injunctive relief to prevent the Defendants from continuing their unlawful agreements.

## II.     JURISDICTION AND VENUE

12.     As this is an action asserting claims under Sections 1 and 2 of the Sherman Act, 28 U.S.C. §§ 1 and 2, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

13.     The Court has subject-matter jurisdiction over the state-law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are factually and legally related to the federal claims such that they form part of the same "case or controversy." Similar state law claims are pending in this District in *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, and thus exercising subject-matter jurisdiction avoids unnecessary duplicity or multiplicity of actions.[7] Supplemental or pendant jurisdiction should be exercised in the interest of judicial economy, and avoiding both duplicative litigation and inconsistent results.

14.     Venue is appropriate in this District under 28 U.S.C. §1391 because the claims alleged in this action accrued in this District and the Defendants regularly transact business within this District, have maintained business offices in this District, and Defendants have directed their conduct towards Plaintiff this District.

15.     Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at persons and businesses residing in, located in, or doing business throughout the United States, including in this District.

## III.     THE PARTIES

---

[6] *Id.* at 29.

[7] Plaintiff has pled all applicable causes of action, but seeks only to presently advance those claims identified by Judge Koh as "10 causes of action for the parties to litigate through resolution." *Xyrem*, ECF No. 83 at 2.

COMPLAINT
*Humana Inc. v. Jazz Pharms., Inc., et al.*
4

16.     Humana is a Delaware corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky. Humana and its subsidiaries purchase Xyrem as part of their business as providers of healthcare related services. Humana has eight million members in all fifty States, Puerto Rico, and the District of Columbia.

17.     Humana is the parent company, and assignee of the claims, of subsidiaries that provide, inter alia: (1) Medicare benefits through contracts with the Centers for Medicare and Medicaid Services ("CMS"), for Medicare beneficiaries through a variety of Medicare Advantage plans; and (2) private commercial health insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual or group basis.  Humana's subsidiaries provide these benefits to beneficiaries in all 50 states, the District of Columbia, and Puerto Rico, and Humana is the second largest Medicare Advantage Organization in the United States.  These assignor subsidiaries are: Arcadian Health Plan, Inc.; CarePlus Health Plans, Inc.; Cariten Health Plan Inc.; CHA HMO, Inc.; CompBenefits Insurance Company; Emphesys Insurance Company; Health Value Management, Inc., dba ChoiceCare Network; Humana Benefit Plan of Illinois, Inc.; Humana Benefit Plan of Texas, Inc.; Humana Employers Health Plan of Georgia, Inc.; Humana Health Benefit Plan of Louisiana, Inc.; Humana Health Company of New York, Inc.; Humana Health Insurance Company of Florida, Inc.; Humana Health Plan of California, Inc.; Humana Health Plan of Ohio, Inc.; Humana Health Plan of Texas, Inc.; Humana Health Plans of Puerto Rico, Inc.; Humana Health Plan, Inc.; Humana Insurance Company; Humana Insurance Company of Kentucky; Humana Insurance Company of New York; Humana Insurance of Puerto Rico, Inc.; Humana Medical Plan of Michigan, Inc.; Humana Medical Plan of Pennsylvania, Inc.; Humana Medical Plan of Utah, Inc.;  Humana Medical Plan, Inc.; Humana Regional Health Plan, Inc.; Humana Wisconsin Health Organization Insurance Corporation; and HumanaDental Insurance Company. Humana's subsidiaries have assigned the claims pleaded herein to Humana.

18.     When Humana's health plans listed above purchase Xyrem, they source Xyrem from Express Scripts and purchase it directly from Express Scripts. Express Scripts then delivers Xyrem to Humana's members in various states. Express Scripts has an exclusive distribution agreement with Defendant Jazz, so Xyrem is not purchased at retail pharmacies like many drugs are. Humana's and/or

its health plans obligation to pay is triggered by the presence of Humana's members, who reside in in all U.S. states.

19.     Humana is also authorized to bring claims through purchases it makes as part of services it offers to other health plans. In particular, Humana offers "Administrative Services Only" ("ASO") services to self-funded health plans and other plans across the United States. Under ASO agreements, Humana's insurer subsidiaries serve as a third-party administrator to the self-funded health plans for purposes of claims processing and other services.

20.     Humana's assignees Humana Health Plan Inc. and Humana Insurance Company made purchases of Xyrem as part of Humana's ASO business. These purchases of Xyrem pursuant to ASO services were done (an continue to be done) as part of Humana's claims processing services done in its ASO capacity. When Humana makes purchases as part of its ASO business, it purchases Xyrem in the same way that it does for its own members by purchasing Xyrem directly from Express Scripts.

21.     Defendant Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at Waterloo Exchange, Waterloo Road, Dublin 4, Ireland. Its U.S. headquarters is located at 3170 Porter Drive, Palo Alto, CA 94304, with offices in Philadelphia, Pennsylvania and Ewing, New Jersey. Jazz principally develops, manufactures and markets brand name drugs.

22.     Defendant Jazz Pharmaceuticals Ireland Limited is a corporation organized and existing under the laws of Ireland, with its principal place of business at Waterloo Exchange, Waterloo Road, Dublin 4, Ireland.

23.     Defendant Jazz Pharmaceuticals Public Limited Company is an Ireland public limited biopharmaceutical company organized and existing under the laws of Ireland, with its principal place of business at Waterloo Exchange, Waterloo Road, Dublin 4, Ireland. Jazz Pharmaceuticals plc common stock is publicly traded in the United States on the NASDAQ stock exchange. Jazz Pharmaceuticals plc is the parent company of Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited.

24.     Each of the three Jazz Defendants was directly and substantially involved in planning and undertaking the anticompetitive acts alleged in this complaint. Among other things, Jazz

1   Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited were parties to the document styled as

2   the "Settlement Agreement" in this complaint. Among other things, Jazz Pharmaceuticals plc was

3   directly involved in the negotiation of the unlawful agreements described in this complaint. The three

4   Jazz entities are referred to collectively as "Jazz."

5       25.   Jazz manufactures and sells Xyrem, the only product approved by the FDA to be

6   marketed in the U.S. for the treatment of both cataplexy and excessive daytime sleepiness, or EDS, in

7   both adult and pediatric patients with narcolepsy.

8       26.   Defendant Hikma Pharmaceuticals plc is a public limited company organized and

9   existing under the laws of the United Kingdom, with its principal place of business at 1 New Burlington

10  Place, London, W1S 2HR and its U.S. headquarters at 246 Industrial Way West, Eatontown, New

11  Jersey, 07724.

12      27.   Defendant Hikma Pharmaceuticals USA Inc. is a corporation organized and existing

13  under the laws of the State of Delaware, with its principal place of business at 246 Industrial Way West,

14  Eatontown, New Jersey, 07724, and is a wholly-owned subsidiary of Hikma plc. Before June 20, 2018,

15  Hikma Pharmaceuticals USA Inc. was organized under the name West-Ward Pharmaceuticals Corp.,

16  which had been acquired by Hikma Pharmaceuticals plc in 1998.

17      28.   Defendant Hikma Labs, Inc. is a corporation organized and existing under the laws of

18  the State of Nevada, with its principal place of business at 1809 Wilson Road, Columbus, Ohio, 43328.

19  Hikma Labs, Inc. was formerly known as Roxane Laboratories, Inc., which was purchased by West-

20  Ward Pharmaceuticals Corp. in 2016 and is now a wholly-owned subsidiary of Hikma Pharmaceuticals

21  plc. In June 2018, the company's name was changed from Roxane Laboratories, Inc. to Hikma Labs,

22  Inc.

23      29.   Defendant Eurohealth (USA), Inc. is a holding company for Hikma Pharmaceuticals

24  USA Inc. and a wholly-owned subsidiary of Hikma Pharmaceuticals plc, organized and existing under

25  the laws of the State of Delaware, with its principal place of business at 246 Industrial Way West,

26  Eatontown, New Jersey, 07724.

27

28

30.     Each of the Hikma-related Defendants was directly and substantially involved in planning, entering into, and performing under the agreements reached beginning in 2017, as alleged in this complaint. Among other things, Roxane Laboratories, Inc., West-Ward Pharmaceuticals Corp., Eurohealth (USA), Inc., and Hikma Pharmaceuticals plc were parties to the document styled as the "Settlement Agreement" in this complaint.

31.     Defendant Amneal Pharmaceuticals LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 400 Crossing Boulevard, Bridgewater, New Jersey, 08807.

32.     Defendant Par Pharmaceutical, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One Ram Ridge Rd., Chestnut Ridge, New York 10977. Par is a subsidiary of Endo International plc, an Irish public limited company with its U.S. headquarters located in Malvern, Pennsylvania. In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par Pharmaceutical, Inc., and combined it with Endo's existing generics subsidiary, Qualitest Pharmaceuticals. As used in this complaint, "Par" encompasses relevant predecessors-and-successors-in-interest.

33.     Defendant Lupin Ltd. is a public limited company organized and existing under the laws of India, with its principal place of business at B/4 Laxmi Towers, Bandra-Kurla Complex, Bandra (E), Mumbai 400 051, India.

34.     Defendant Lupin Pharmaceuticals Inc., a wholly-owned subsidiary of Lupin Ltd., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 111 South Calvert Street, Baltimore, Maryland, 21202.

35.     Defendant Lupin Inc., a wholly-owned subsidiary of Lupin Ltd., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 111 South Calvert Street, Baltimore, Maryland, 21202.

36.     All of Defendants' wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives

1    while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-

2    interest) within the course and scope of their duties and employment, and/or with the actual, apparent,

3    and/or ostensible authority of Defendants.

4    **IV.    REGULATORY BACKGROUND**

5         **A.    Regulatory Structure for Approval and Substitution of Generic Drugs.**

6              **1.    The Prescription Drug Market Place**

7         37.    Defendants manipulated the unique features of the prescription drug marketplace,

8    ensuring that their anticompetitive market allocation scheme would reap them the maximum profits to

9    the detriment of purchasers such as Plaintiff.

10        38.    In the pharmaceutical marketplace, the consumer does not freely select pharmaceuticals

11   as her or she does groceries in a supermarket.

12        39.    Prescription drugs may be dispensed only pursuant to a doctor's prescription. For a

13   given script, and a pharmacist may dispense only the brand-name drug named in the prescription or its

14   AB-rated, FDA-approved generic equivalent.

15        40.    In most instances, the patient and his health insurer pay for the prescription drug that a

16   doctor has prescribed.  Like the pharmacist, their "choice" is limited to the brand name drug named in

17   the prescription or its AB-rated generic equivalent.

18        41.    Therefore, the doctor's prescription defines the relevant product market, because it

19   limits the consumer's (and pharmacist's) choice to the drug named therein.

20        42.    When there is no generic competition for a brand name drug, the brand manufacturers

21   can set and maintain prices without losing market share. The ability to do this is the result of the brand

22   name drug company's monopoly power over the market for that drug in both its brand name and

23   generic form.

24             **2.    The Hatch-Waxman Act and FDA Approval Process.**

25        43.    The Federal Food, Drug and Cosmetics Act (21 U.S.C. §§ 301-392) ("FDCA"), provides

26   that a manufacturer that creates a new drug must obtain the approval of the FDA to sell the new drug

27   by filing a New Drug Application ("NDA"). An NDA is submitted with extensive, expensive testing

28

1    data, that must include submission of specific data concerning the safety and efficacy of the drug and

2    identify any patents claiming the drug. 21 U.S.C. § 355(b).

3         44.    To encourage substitution of generic drugs, and reign in high drug costs, Congress in

4    1984 amended the FDCA with the enactment of the Hatch-Waxman Act ("Hatch-Waxman"). The

5    Hatch-Waxman Act streamlined and simplified the process for approving generic drugs. The Act

6    replaced the lengthy and costly NDA approval process with an expedited Abbreviated New Drug

7    Application ("ANDA") process. ANDA was intended to be a game-changer that would reduce the

8    regulatory hurdles for prospective generic manufacturers.[8] Under the Act, an ANDA applicant may rely

9    on the safety and efficacy findings of the NDA for the referenced brand-name drug, if the ANDA

10   demonstrates the proposed generic drug is "bioequivalent," i.e., it contains the same active ingredient(s),

11   dosage form, route of administration, and strength as the brand-name drug, and is absorbed at the same

12   rate and to the same extent as the brand-name drug.

13        45.    For drugs that are submitted through this ANDA process successfully, the FDA assigns

14   them an "AB" rating. To be an "AB" rated generic drug is to be in the eyes of U.S. regulatory authorities

15   a substitute for the brand drug in terms of the ingredients and efficacy.

16        46.    The Act, along with paving the road for generic competition, gave some protection to

17   brand manufacturers in the form of delay to facilitate legitimate exercise of brand manufacturer's patent

18   rights. The Act allowed the brand-name manufacturer a 30-month stay, simply by filing a patent

19   infringement lawsuit. This process, which gives the equivalent of a preliminary injunction to the brand

20   manufacturer for up to 30 months has, sadly, been repeatedly abused by brand manufactures who file

21   frivolous patent lawsuits to delay generic competition.[9]

22        47.    When the FDA approves a brand-name manufacturer's NDA, it lists in a publication

23   entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the

24   _____

25   [8] See Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

26   [9] C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 New York Univ. L. Rev. 1553 (2006); Rebecca S. Eisenberg & Daniel A. Crane, *Patent Punting: How FDA and Antitrust Courts Undermine the Hatch-Waxman Act to Avoid Dealing with Patents*, 21 Mich. Telecomm. & Tech. L. Rev. 197 (2015); Saami Zain, *Antitrust Liability for Maintaining Baseless Litigation*, 54 Santa Clara L. Rev. 729 (2014).

27

28

1  "Orange Book") any patents which, according to the information supplied to the FDA by the brand-
2  name manufacturer: (1) claim the approved drug or its approved uses; and (2) for which a "claim of
3  patent infringement could reasonably be asserted if a person is not licensed by the owner engaged in the
4  manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(g)(7)(A)(iii).

5      48.   To obtain FDA approval of an ANDA the generic manufacturer must certify that it will
6  infringe no patent listed in the Orange Book claiming the brand-name drug, because either: (1) No
7  patent for the brand-name drug has been filed with the FDA (a "Paragraph I Certification"); (2) The
8  patent for the brand-name drug has expired (a "Paragraph II Certification"); (3) The patent for the
9  brand-name drug will expire on a particular date and the generic company does not seek to market its
10  generic product before that date (a "Paragraph III Certification"); or (4) The patent for the brand-name
11  drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV
12  Certification").[10] When a generic manufacturer files a Paragraph IV Certification, it must notify the
13  brand manufacturer and patent owner, and Hatch-Waxman makes the ANDA filing itself an artificial act
14  of patent infringement, entitling the patent holder to sue for injunctive relief.

15      49.   If the patent holder sues the ANDA filer within 45 days of receiving the Paragraph IV
16  Certification, Hatch-Waxman prevents the FDA from granting final approval to the ANDA until the
17  earlier of (a) 30 months after the lawsuit is commenced, or (b) the court presiding over the patent
18  infringement action rules that the patent is invalid or not infringed by the ANDA. 21 U.S.C. §
19  355(j)(5)(B)(iii).  It is almost always the case that the 30 months expire before the court rules, resulting in
20  a 30-month statutory stay.

21      50.   However, during the 30-month stay, the FDA may grant "tentative approval" to an
22  ANDA applicant if the FDA determines that the ANDA would otherwise qualify for final approval, but
23  for the 30-month stay.

24      51.   Hatch-Waxman grants a 180-day period of market exclusivity to the first Paragraph IV
25  ANDA applicant to file a substantially complete ANDA. During the 180-day exclusivity period

27  [10] 21 U.S.C. § 355(g)(2)(A)(vii).

28

COMPLAINT
*Humana Inc. v. Jazz Pharms., Inc., et al.*
11

(measured from the first commercial marketing of the generic drug or the date of a court decision finding the listed patent invalid, unenforceable, or not infringed, 21 U.S.C. § 355(j)(5)(B)(iv)); see also 21 C.F.R. § 314.107(c)(1)), the first ANDA filer enjoys 180 days of freedom from competition from other generic versions of the drug, and during that period can capture almost all of the market for the drug while selling the generic for higher prices than the market will support after additional generics enter the market.

52.     The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first filer.[11]

53.     Prior to 2003, if the first filer did not commercially market the generic drug and there is no court decision on the relevant Orange Book-listed patent, the commencement of the first filer's 180-day exclusivity period will be delayed indefinitely, blocking final FDA approval of all subsequent ANDAs. This is colloquially referred to as "bottlenecking" or the "statutory block" of a subsequent ANDA.

54.     To frustrate and prevent this type of collusive behavior, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act of 2003 (Public Law 108-173; 21 U.S.C. A. § 355(j)(5)(D)) ("MMA"). The MMA creates numerous conditions under which a first filer forfeits its 180-day exclusivity, thereby allowing other ANDA filers to enter the market. For example, forfeiture occurs if the first filer fails to obtain tentative approval within 30 months from filing, unless the failure is caused by a change in, or review of, the approval requirements.

55.     Under the "Agreement with another applicant" provision, 21 U.S.C. A. § 355(j)(5)(D)(i)(V), the first filer will forfeit the exclusivity period if it "enters into an agreement with another applicant under this subsection for the drug, the holder of the application for the listed drug, or an owner of the patent that is the subject of the [Paragraph IV certification]…."

56.     Under the "failure to market" provision, 21 U.S.C.A. § 355(j)(5)(D)(i)(I), a first filer forfeits its 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the

---

[11] *FTC v. Actavis, Inc.*, 570 U.S. 136, 144 (2013) (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. REV. 1553, 1579 (2006)).

date that is (1) 75 days after receiving final FDA approval; or (2) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents qualifying the first applicant for exclusivity (i.e., as to each patent for which the first applicant submitted a Paragraph IV certification), at least one of the following has occurred: (1) a final decision of invalidity or non-infringement; (2) a settlement order entering final judgment including a finding the patent is invalid or not infringed; or (3) the NDA holder delists the patent from the Orange Book.

57.     Branded manufacturers and first filers can structure their "pay-for-delay" settlements to circumvent the above provisions and keep the 180-day exclusivity in place by, among other things, settling their litigation before a final judgment of invalidity or non-infringement can be entered, or by seeking a consent judgment that does not include a finding that all the patents for which the first filer submitted a Paragraph IV certification were invalid or not infringed. Consequently, a subsequent ANDA filer can fight this only by itself obtaining a judgment that all patents for which the first filer filed a Paragraph IV certification are invalid or not infringed, thereby triggering forfeiture of the first filer's 180-day exclusivity rights.

58.     When the FDA approves an ANDA, that generic drug receives an "AB" rating from the FDA, signifying it is therapeutically equivalent to the brand-name drug. Therapeutic equivalence indicates that the generic is both pharmaceutically equivalent (same dosage form, route of administration, identical strength or concentration) and bioequivalent (no significant difference in the rate and extent of absorption of the active pharmaceutical ingredient) to the brand-name drug.

59.     Typically, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts.  When multiple generic manufacturers enter the market, prices for generic versions of a brand-name drug predictably decrease, sometimes as much as by 90% because of price competition among generic manufacturers.  This price drop starts immediately when one generic manufacturer enters the market and quickly accelerates as other manufacturers enter.

60.     The FDA also reports that in 2010, the use of FDA-approved generics saved $158 billion, or $3 billion per week, and that one year after entry, a generic drug takes over 90% of the

1  corresponding brand-name drug's sales at 15% of the price. Generic drug entry, therefore, is a huge

2  threat to the continued profitability of a branded drug.

3       61.     As the price gap between the brand-name drug and its corresponding generic drug

4  widens, the former's sale's volume shrinks. Price is the only material difference between a brand-name

5  drug and its AB-rated generic equivalent.

6       62.     Due to Hatch-Waxman and follow on legislation, for every step in the prescription drug

7  sales and distribution process there is a financial benefit in prescribing generic drugs. Except for the

8  brand-name drug manufacturer.

9       63.     Pharmacies normally earn a higher markup on generic drugs because of pricing structure

10 and federal reimbursement rules; private health insurers typically offer incentives to pharmacies to fill

11 prescriptions with generics; and to incentivize patients to request generic drugs, health insurers often

12 offer lower copays for generic drugs than for brand-name drugs. A prescription drug may be dispensed

13 in the United States to a patient only by a licensed pharmacist pursuant to a doctor's prescription which

14 identifies the drug, and the prescription may be filled only with the brand name drug identified or an

15 AB-rated generic version of the brand name drug. Pharmacists may (and, in most states, must) substitute

16 an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the

17 prescribing doctor.

18      64.     Automatic substitution laws, passed since the Hatch-Waxman Amendments, provide

19 further savings to consumers. Every state has adopted drug product selection laws that either require or

20 permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the

21 prescribing physician specifically directs that substitution is not permitted). Substitution laws and other

22 institutional features of pharmaceutical distribution and use facilitate both a rapid price decline and a

23 rapid sales shift from the brand to the generic following the launch of AB-rated generic. Generic

24 competition enables purchasers to purchase a generic version of a brand-name drug at substantially

25 lower prices. However, until generic manufacturers enter the market with an AB-rated generic, there is

26 no bioequivalent generic drug which competes effectively with the brand-name drug, and therefore, the

27 brand-name manufacturer can continue to charge supra-competitive prices without losing sales. Given

28

their acute knowledge of the effects of generic entry into a market, brand-name manufacturers like Jazz have a strong incentive to delay the entry of a generic drug onto the market, including by entering reverse, "pay for delay" settlement agreements and filing frivolous lawsuits, among other anticompetitive tactics.

            **3.      Use of Authorized Generics to Maximize Profits Following Generic Entry.**

65.    Rational profit-maximizing brand drug companies sell authorized generics ("AGs") in order to capture part of the competing AB generic drug market following generic entry. Brand AGs compete on price with AB generic upstarts. "[P]harmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[12]

66.    The AG is chemically identical to the brand drug, as with other AB generic drugs.

67.    Brand drug manufacturers generally only employ AGs following generic entry to avoid competing with their own brand product. To facilitate this strategy a brand manufacturer may sell an AG before the first-filed generic manufacturer enters the market so that it can take advantage of existing networks and pipelines prior to the broader entry of generic competition.

68.    Competition from a brand's AG leads to lower prices and profits for the first-filed generic entrant.  Empirical analysis of drug markets show "authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[13]

69.    It is generally accepted that, as estimated by the FTC, an AG reduces the first-filed generic manufacturer's revenues by about 50% on average. This is due to the lower market share, and the lower prices that prevail when a first-filed generic manufacturer encounters an AG.

70.    AGs are pro-competitive because they can result in purchasers and third-party payors such as Plaintiff paying far less for AB generic drugs. They are the only potential source of price competition during a first-filed generic manufacturer's 180-day exclusivity period.

---

[12] Kevin A. Hassett & Robert J. Shapiro, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals* 3, SONECON (2007), *available at* http://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf.

[13] Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, 26 HEALTH AFFAIRS 790, 796 (2007).

71.     When the brand manufacturer's brand product competes against only the first-filer generic manufacturer's product, the two manufacturers enjoy a duopoly. Profit margins are very high without additional generic competition. These high margins benefit the brand and generic manufacturers in a market allocation scheme to the detriment of third-party payors such as Plaintiff, which pay the profits in the form of supracompetitively priced Xyrem. Thus the brand and the generic manufacturer share a common aim to prevent competition from other generic manufacturers.

72.     To preserve the high margins and profits for longer periods of time, brand and generic manufacturers began to agree to "no-AG" provisions. Patent litigation that is settled with "no-AG" agreements deliver exclusivity and the ability to charge high prices to the generic manufacturer during the 180-day exclusivity period. The agreement to allow future generic entry with a "no-AG" provision in a settlement is therefore tantamount to a large cash payment.

### 4.     Acceleration Clauses As a "Poison Pill" to Further Generic Entry.

73.     To enforce an anticompetitive "no AG" agreement, the brand and generic manufacturers at times resort to a deterrent for future generic manufactures seeking to challenge a weak patent. Later-filed generic manufacturers could win a challenge to the patent, or it could negotiate entry in the event the first-filed generic manufacturer loses its exclusivity. To guard their monopoly against these contingencies, brand and generic companies use acceleration clauses, such as most favored entry agreements.

74.     Acceleration clauses serve as a bottle-neck, and a disincentive for other generic companies to come to market.[14]

75.     Acceleration clauses included in a "pay to delay" settlement accelerate the otherwise delayed entry in the event a later-filed generic manufacturer is successful in entering the market. Under these provisions, the first-filed generic manufacturer's entry date is accelerated to the same date as the successful later-filed generic manufacturer.

76.     This provision operates as a "poison pill" with respect to other potential entrants in the market for generic manufacturing by providing a disincentive to enter the market. There is a disincentive

---

[14] Keith M. Drake & Thomas G. McGuire, *Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements*, 16 J. Competition L. & Econ. 188, 188 (2020)

1  for potential generic entrants because they would have to share the generic market with the first-filed

2  generic manufacturer.

3      77.     These provisions enforce the "pay to delay" provisions by diminishing the value of any

4  opportunity to take advantage of the first-filed generic manufacturer's decision to agree to delay its

5  entry. Most-favored entry clauses can also contain a provision that goes even further and provides that

6  the brand manufacturer will not grant a patent license to any other generic manufacturer to enter the

7  market under the authority of the generic competitor's ANDA until a defined period of time after the

8  first filer enters. The clause may state that the brand manufacturer will not grant a license to any later

9  filer to enter the market until 180 days after the first filer enters.

10     78.     A most favored entry "plus" agreement forecloses the possibility that the brad will

11  license its patents to a second generic manufacturer, which can then enter the market under its own

12  ANDA. Most favored entry "plus" agreements eliminate the ability of later-filed generic manufacturers

13  to negotiate a licensing agreement with a brand manufacturer as part of a settlement, and further

14  disincentivize other generic manufacturers from challenging weak patents.

15     79.     Empirical study demonstrates the anticompetitive nature of acceleration clauses.  Such

16  "acceleration clauses have never promoted earlier generic entry where, as here, the first-filer (Hikma) has

17  retained its 180-day period of exclusivity."[15] Indeed, in "the 54 cases in which the first filer retained sole

18  rights to the 180-day exclusivity period, there were no cases of early generic entry. In other words, there

19  were no cases in which the firstfiler's entry was accelerated, and there were no cases in which a different

20  generic entered before the entry date set in the first-filer's settlement."[16]

21  ## V.   DEFENDANTS' ANTICOMPETITIVE CONDUCT

22  ### A.   The Development of Sodium Oxybate

23     80.     Synthesis of the chemical sodium oxybate was first reported in 1874. Beginning in the

24  1960s, sodium oxybate, under the name GHB,[17] was marketed in the United States as an unregulated

25  _____

26  [15] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 39 (N.D. Cal. Aug. 13, 2021)

27  [16] Drake & McGuire, supra, at 194.

28  [17] Gamma-hydroxybutyric acid (GHB) Critical Review Report, World Health Organization Expert Committee on Drug Dependence Thirty-fifth Meeting, Hammamet, Tunisia, 4-8 June 2012.

COMPLAINT
*Humana Inc. v. Jazz Pharms., Inc., et al.*

dietary supplement in health food stores, training gyms, fitness centers, and on the Internet beginning in the 1980s.[18]11 It was also the subject of numerous preclinical and clinical studies for treatment of various diseases and conditions, including treatment of insomnia.

81.     By 1990, GHB had gained notoriety as a substance of abuse. Users reported effects of disinhibition similar to that associated with alcohol consumption but without "hangover" effects. At the same time, an increasing number of people taking GHB experienced overdoses requiring hospital emergency care; many had combined GHB with alcohol, which produces synergistic CNS depressant effects. GHB was also implicated in an increasing number of drug-facilitated sexual assaults. Like many other CNS depressants, GHB can cause anterograde amnesia, especially when combined with alcohol, leaving the assault victim unable to recall details of the event.

82.     In 1990, the FDA warned against, and then banned, consumption of GHB after several reports of overdose. Despite the ban on sales, GHB continued to be abused, which eventually resulted in the DEA designating it as a Schedule I controlled substance under the Controlled Substances Act. This designation threatened to hinder future development of GHB for therapeutic applications. Successful lobbying efforts on behalf of physicians and patients, however, led to modification of the Controlled Substance Act to create a bifurcated schedule for GHB, allowing sodium oxybate to be designated a Schedule III controlled substance for medical purposes while retaining Schedule I penalties for illegal use.

**B.     Sodium Oxybate as a Treatment for Narcolepsy**

83.     "The journey for Orphan Medical began in 1994 when the FDA approached the company to gauge its interest in developing GHB as a treatment for narcolepsy. The drug previously had been under development for narcolepsy by , a symptom of the chronic sleep disorder narcolepsy, is an alarming condition, resulting in sudden, brief episodes of muscle weakness or paralysis brought on by strong emotions such as laughter, anger, surprise, or anticipation."[19]

---

[18] David E. Fuller, M.D., and Carl S. Hornfeldt, Ph.D., From Club Drug to Orphan Drug; Sodium Oxybate (Xyrem) for the Treatment of Cataplexy, Pharmacotherapy 2003; 23(9): 1205–1209.
[19] Elisabeth Pena, "Xyrem: Awakenings," PharmaVOICE (October 2002); https://www.pharmavoice.com/article/2002-10-xyrem-awakenings/

84.     Studies that dated back to the 1970s strongly suggested that sodium oxybate could be used to treat narcolepsy.

85.     "Narcolepsy is a chronic sleep disorder characterized by overwhelming daytime drowsiness [excessive daytime sleepiness or 'EDS'] and sudden attacks of sleep. People with narcolepsy often find it difficult to stay awake for long periods of time, regardless of the circumstances. Narcolepsy can cause serious disruptions in your daily routine. Sometimes, narcolepsy can be accompanied by a sudden loss of muscle tone (cataplexy), which can be triggered by strong emotion."[20]

86.     Narcolepsy is a chronic condition for which there's no cure.

87.     Jazz banked on the fact that narcolepsy was a chronic condition, and that "90% of insured patients have access" to the drug, and that health plans overwhelmingly footed the bill for payment for Xyrem.[21]

88.     Orphan Medical eventually submitted a new drug application to the FDA. On July 17, 2002, the FDA approved sodium oxybate for the treatment of cataplexy in patients with narcolepsy. The approval provided New Chemical Entity ("NCE") exclusivity through July 17, 2007. The FDA extended the exclusivity period to July 17, 2009 when it designated Xyrem an orphan drug because it treated a rare disease.

89.     Orphan Medical branded the product Xyrem. Xyrem is an oral solution that is recommended to be taken two times each night, the first dose right at bedtime and the second dose two-and-a-half to four hours later.

90.     Because of concerns about the risk of drug diversion, Orphan Medical collaborated with the FDA, experts in drug abuse prevention, and clinicians to create the Xyrem Risk Management Program, known as "RiskMAP." The program's goals were to ensure responsible distribution of Xyrem to patients with narcolepsy and to provide education to physicians and patients about safe and responsible administration of the drug.  Components of the original plan included:  (a) a single, centralized pharmacy housed in a secure facility; (b) a program to educate physicians and patients about the risks and benefits of Xyrem; (c) requiring prescribers and patients to read educational materials

[20] https://www.mayoclinic.org/diseases-conditions/narcolepsy/symptoms-causes/syc-20375497
[21] https://www.sec.gov/Archives/edgar/data/1232524/000119312511252617/d234572d425.htm

before filling the initial prescription; and (d) maintenance of a registry of all patients and a record of all prescribers.

91.     Xyrem was and is exclusively dispensed by Express Scripts Specialty Distribution Services, Inc. ("ESSDS"), the only pharmacy authorized under the REMS program to distribute Xyrem. The centralized pharmacy maintained comprehensive patient and physician registries and verified the eligibility of prescribing physicians before filling Xyrem prescriptions. In addition, pharmacists were trained to be alert for compliance issues and suspicious behavior. Under the RiskMap program, Orphan owned the inventory and the centralized pharmacy maintained it on consignment. From the date of its FDA approval, Jazz has dispensed Xyrem directly to patients under the RiskMAP and REMS through ESSDS.

92.     ESSDS ships and distributes Xyrem directly to Humana's members.

**C.     Jazz Obtains All Rights To Xyrem Through Orphan Medical Acquisition**

93.     In April 2005, Jazz Pharmaceuticals, then a small privately held drug company formed in 2003, announced plans to acquire Orphan Medical (and thereby all rights to Xyrem) in a leveraged acquisition.[22]13 Xyrem has since been Jazz's main source of revenue, contributing up to 75% (or more) of Jazz's revenue.

94.     The FDA approved Xyrem for the treatment of EDS in adult patients with narcolepsy in October 2005. EDS is the most common and disabling symptom of narcolepsy. It is present in all patients with the disease.

95.     Subsequent to approval, the FDA granted Xyrem an NCE exclusivity of five years from the NDA approval date, expiring on July 17, 2007, and orphan drug exclusivity of seven years from the NDA approval date, expiring on July 17, 2009. These exclusivity grants meant that Xyrem would not face competition from generic competitors until at least mid-2009.

---

[22] Businesswire, Jazz Pharmaceuticals to Acquire Orphan Medical; Combines Orphan Medical's Growing Central Nervous System Product and Commercial Team with Jazz Pharmaceuticals' Development Pipeline (Apr. 19, 2005), available at https://tinyurl.com/y3ev85of.

**D.    The Xyrem Patents**

96.    After acquiring Orphan Medical, Jazz filed for and obtained several patents claiming aspects of Xyrem and its use. According to a Congressional report, evergreening "is the practice of filing for new patents on secondary features of a particular product as earlier patents expire, thereby extending patent exclusivity past the original twenty-year term. Later-filed patents may delay or prevent entry by competitors, thereby allowing the brand-name drug manufacturer (the brand) to continue charging high prices."[23]

97.    Evergreening covers "secondary" aspects of brand drug, such as dosages, method of use, and does not concern active ingredients. Evergreening allows weak secondary patents to unduly delay generic entry: "the combination of secondary patents and a strong primary patent creates a barrier to generic entry because a generic manufacturer may delay or simply decline entry when faced with the prospect of defeating both patents."[24]

98.    When Jazz acquired Orphan Medical it obtained a series of secondary patents—the '431 family, the '730 family, and the '302 family—through evergreening.

**1.    The '431 Family Of Patents (Formulations And Methods Of Treatment)**

99.    The parent patent for the '431 family of patents is U.S. Patent Application No. 09/470,570 (filed Dec. 22, 1999). Jazz obtained the '431 patents eight to seventeen years after the parent patent, as part of an "evergreening" strategy to frustrate generic competition. The '431 patents are:

THE '431 PATENT FAMILY: LISTED IN THE ORANGE BOOK

| U.S. Patent No. | Application Date | Issue Date | Expiry (without pediatric exclusivity) |
|---|---|---|---|
| 7,262,219 | July 7, 2004 | Aug. 28, 2007 | July 4, 2020 |
| 7,851,506 | July 13, 2007 | Dec. 14, 2010 | Dec. 22, 2019 |
| 8,263,650 | Apr. 13, 2012 | Sept. 11, 2012 | Dec. 22, 2019 |

---

[23] Kevin T. Richards, Kevin J. Hickey, and Erin H. Ward, "Drug Pricing and Pharmaceutical Patenting Practices," Congressional Research Service (Feb. 11, 2020), at 1; https://sgp.fas.org/crs/misc/R46221.pdf.

[24] Id. at 17.

| | | | |
|---|---|---|---|
| 8,324,275 | Apr. 13, 2012 | Dec. 4, 2012 | Dec. 22, 2019 |
| 8,859,619 | Nov. 26, 2012 | Oct. 14, 2014 | Dec. 22, 2019 |
| 8,952,062 | March 6, 2013 | Feb. 10, 2015 | Dec. 22, 2019 |
| 9,539,330 | Nov. 9, 2015 | Nov. 8, 2016 | Dec. 22, 2019 |

100.    The '431 family concerns formulations of patents includes formulations of sodium oxybate or other salts of GHB (the '889, '219, '650, '619, and '330 patents); methods of treatment (the '506, '650, '275, and '062 patents); and manufacturing processes (Patent No. 6,472,421, issued Oct. 22, 2002 and expired Dec. 22, 2019, and Patent No. 8,461,203, issued June 11, 2013 and expired Dec. 22, 2019, neither of which are listed in the Orange book).[25]

### 2.    The '730 Family Of Patents (Drug Distribution System And Method)

101.    The parent patent to the '730 family is U.S. Patent Application No. 10/322,348 (filed on Dec. 17, 2002). The Orange book listed '730 family of patents are:[26]

THE '730 PATENT FAMILY: LISTED IN THE ORANGE BOOK

| U.S. Patent No. | Application Date | Issue Date | Expiry (without pediatric exclusivity) |
|---|---|---|---|
| 7,668,730 | Dec. 17, 2002 | Feb. 23, 2010 | June 16, 2024 |
| 7,765,106 | Nov. 2, 2004 | July 27, 2010 | June 16, 2024 |
| 7,765,107 | Apr. 1, 2005 | July 27, 2010 | June 16, 2024 |
| 7,895,059 | Feb. 11, 2010 | Feb. 22, 2011 | Dec. 17, 2022 |
| 8,457,988 | Aug. 27, 2012 | June 4, 2013 | Dec. 17, 2022 |
| 8,589,182 | Aug. 27, 2012 | Nov. 19, 2013 | Dec. 17, 2022 |
| 8,732,963 | Aug. 22, 2012 | May 20, 2014 | Dec. 17, 2022 |

---

[25] Most '431 family patents were set to expire on December 22, 2019. The '889 and '219 patents, however, received adjustments under 35 U.S.C. § 154(b). In 2018, the FDA granted pediatric exclusivity to the Orange Book-listed patents, and that six-month exclusivity expired June 22, 2020 (for the '506,'650, '275, '619, '062 and '330 patents) and January 4, 2021 (for the '889 and '219 patents)

[26] The '730 family also includes a questionable non-Orange Book United States Patent No. 7,797,171, covering an "exclusive" central computer database for controlled distribution As it was never listed in the Orange Book, it was never listed in a Xyrem ANDA application.

102.    The patents in the '730 family are secondary as they "relat[e] to a drug distribution system for tracking prescriptions of a 'sensitive drug.'" *Jazz Pharmaceuticals, Inc. v. Amneal Pharmaceuticals, LLC*, 895 F.3d 1347, 1350 (Fed. Cir. 2018).

103.    Subsequently the FDA granted pediatric exclusivity extension (to December 16, 2024) for the '730, '106 and '107 patents, and for the '059, '988, '182, and '963 patents (to June 17, 2023). The Patent Trial and Appeal Board ("PTAB") invalidated the '730 family as explained below.

### 3.    The '302 Family Of Patents (Method Of Administration)

104.    The parent patent to the '302 family is (filed  United States Patent Application No. March 15, 2013). The Xyrem-related '302 family of patents listed in the Orange Book  are:

THE '302 PATENT FAMILY: LISTED IN THE ORANGE BOOK

| U.S. Patent No. | Application Date | Issue Date | Expiry (without pediatric exclusivity) |
|---|---|---|---|
| 9,050,302 | Mar. 15, 2013 | June 9, 2015 | Mar. 15, 2033 |
| 8,772,306 | Apr. 29, 2013 | July 8, 2014 | Mar. 15, 2033 |
| 9,486,426 | May 8, 2015 | Nov. 8, 2016 | Mar. 15, 2033 |
| 10,213,400 | Jan. 12, 2018 | Feb. 26, 2019 | Mar. 15, 2033 |

105.    The patents in the '302 family asserted methods of treatment for reducing GHB sales in treating sleep disorders, when a patient is already taking valproate or divalproex sodium.

106.    Subsequently the FDA granted pediatric exclusivity extension to the Orange Book-listed '302 family patents for Xyrem (to September 15, 2033).[27]

### E.    Jazz Jacks Up Xyrem Prices "to the Moon".

107.    Prior to exploiting its Xyrem monopoly, Jazz was foundering. Jazz announced a "net loss" of $138.8 million for the 2007 fiscal year.[28]

---

[27] This extension did not apply to the '400 patent, not listed in the Orange Book until 2019, and which is not currently listed in the Orange Book with pediatric exclusivity.
[28] https://investor.jazzpharma.com/news-releases/news-release-details/jazz-pharmaceuticals-inc-announces-fourth-quarter-and-full-year

108.    Jazz's Initial Public Offering ("IPO"), held in June 2007, was a disappointment. It missed its target price of $24 to $26 per share, raising $108 million at $18 a share.[29]

109.    In 2008 and 2009, Jazz's stock price cratered, and serious questions were raised about its solvency. Jazz had negative equity, meaning its debt exceeded the value of all its asset: "[Jazz was] in default on our debt, literally talking to bankruptcy attorneys every day,"[30] according to its CEO. How did Jazz "turnaround," raising its stock price from $0.53?

110.    Jazz increased the price of Xyrem "To the Moon, Alice!"[31]

111.    Jazz's price increases started gradually in 2009: it told investors in June 2010 "Total product sales were $34.3 million in the first quarter, an increase of 61% over the first quarter of 2009 driven primarily by price increases taken on Xyrem during 2009."[32] Its first quarter 2010 revenues roughly equaled its yearly revenue in recent years.

112.    On May 1, 2010 Jazz announced a 15% price increase for Xyrem.

113.    Jazz assured its investors on a June 2010 investor call that these price increases were sustainable: "it's important to remember that the vast majority of our Xyrem patients have fixed monthly co-pays. These patients should not see any impact to their monthly co-pay from price increase. Approximately 80% of our Xyrem patients have monthly out-of-pocket costs of $50 or less."[33] The reason Jazz had such confidence is because it knew Humana and other end-payors were footing the massive bill.

114.    In November 2010 Jazz raised the price of Xyrem another 22%. Robert M. Myers, Jazz's president, explained the strategy with the incremental price increases: "We do want to avoid big jumps in price, abrupt changes in price, which can have a negative impact on payers, physicians and, most importantly, patients."[34] But these steady price increases added up.

---

[29] https://www.bizjournals.com/sanjose/stories/2007/05/28/daily56.html
[30] https://www.jazzpharma.com/wp-content/uploads/2015/10/Life-Science-Leader.pdf
[31] https://www.cbsnews.com/news/how-a-sleeping-drug-company-increased-prices-300-without-anyone-noticing/
[32] https://seekingalpha.com/article/203249-jazz-pharmaceuticals-inc-q1-2010-earnings-call-transcript
[33] Id.
[34] https://www.nytimes.com/2011/01/02/business/02coupon.html

COMPLAINT
*Humana Inc. v. Jazz Pharms., Inc., et al.*
24

115.    Jazz CEO Cozadd noted Jazz had "substantial pricing power" because there is "nothing else that does what [Xyrem] does. There is no substitute."[35]

116.    Jazz's price increases stood out, even in a crowded field of greedy companies that sought to take advantage of patients on maintenance medications need to treat long-term conditions. "Pharmaceutical industry expert Tracy Staton, from FiercePharma, said the company had increased the cost of Xyrem by more than 800 per cent in seven years. 'Jazz's price increases have been quite large, among the very biggest price increases among drugs in the last 10 years,' she said. 'We did a ranking in 2014 across the industry and Jazz was at the top.'"[36]

117.    Bloomberg published data showing that Jazz increased prices by 841% from 2007 to 2014 alone: "According to Bloomberg data, this year Xyrem costs $19.40 per 1-milliliter dose, up from just $2.04 in 2007--an 841% jump. And it's those price hikes that accounted for most of last year's sales growth, according to the Irish company's annual report. Volume increased by 12% last year, with the price rocking up by nearly one-third."[37]

### F.    Jazz Seeks A Multiple Pharmacy Rems In Conjunction With Its Request For Approval To Market Xyrem For Fibromyalgia

118.    As Jazz's ability to raise price was central to its business philosophy, Jazz took a series of measures to wall off generic competition. Jazz's REMS proposal was one way Jazz managed to restrict competition.

119.    After first promulgating single-pharmacy distribution Jazz proposed to change the REMS process in August 2009 by certifying multiple pharmacies in its distribution. In doing so Jazz admitted by implication this would increase access and still be safe.[38]

---

[35] Final Transcript, Jazz Pharmaceuticals Inc. at LCM Annual Healthcare Conference (Nov. 17, 2010), available at https://tinyurl.com/y4lchnrs.
[36] https://www.abc.net.au/news/2017-06-24/narcolepsy-xyrem-drug-company-slammed-for-price-hikes/8647626
[37] https://www.fiercepharma.com/special-report/xyrem-jazz-pharmaceuticals
[38] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 9-12 (N.D. Cal. Aug. 13, 2021)

120.     Jazz then sought FDA approval for a new indication of Xyrem in December 2009, to treat fibromyalgia. The FDA rejected this request, by a panel vote of 20-2, which included REMs with "proposed distribution from 15 pharmacies to meet the expected larger demand" for fibromyalgia.[39]

**G.     Generic Challengers Make Paragraph IV Certifications.**

121.     Roxane, which was acquired by Hikma, was the first filer, filing in July 2010 an ANDA for a 500 mg/ml product that listed multiple Xyrem Orange Book patents (the '107, '889, '219, '730, '106 patents) in its Paragraph IV certifications. Roxane thus was entitled to the 180 days of exclusivity. On October 14, 2010 Roxane sent Jazz a Paragraph IV letter that explained these five patents were invalid, unenforceable, and/or not infringed.

**H.     Jazz Files Sham Litigation to Combat Roxane's (Now Hikma's) Threat.**

122.     Jazz sued Hikma on November 22, 2010 alleging infringement of the five patents. In early 2011, Jazz commenced two additional lawsuits to add three more patents.

123.     In the District of New Jersey Jazz filed nine lawsuits: 2:10-cv-06108 (covering the '889, '219, '730, '106,'107 patents); 2:11-cv-00660 (the '431, '506 patents); 2:11-cv-02523 (the '059 patent); 2:12-cv-06761 (the '650 patent); 2:12-cv-07459 (the '275 patent); 2:15-cv-01360 (the '203, '306, '619 patents); 2:15-cv-03684 (the '062 patent); 2:16-cv-00469 (the '302 patent); 2:16-cv-04971 (the '963 patent).

124.     Jazz's litigation was a delay tactic in which it took advantage of learning Hikma's non-infringement defenses to stall litigation even more patent applications. It then used these newly issued patents in yet more patent infringement lawsuits.

125.     Jazz's shifting positions caused litigation to mushroom.

126.     Jazz learned in the first lawsuit (2:10-cv-06108) that Hikma would argue the '219 or '889 patents were non-infringed because Hikma included no "pH adjusting agent." What did Jazz do? It filed for and obtained the '650 patent, in which Jazz claimed patent protection for a formulation that also had no "pH adjusting agent" in its formulation. Then it sued Hikma in 2:12-cv-06761 under the '506 patent.

---

[39] Lisa Richwine, "US FDA panel rejects Jazz drug for fibromyalgia," Reuters (Aug. 20, 2010); https://www.reuters.com/article/jazz-fda/update-3-us-fda-panel-rejects-jazz-drug-for-fibromyalgia-idUSN2013534120100820

127.    Jazz's '506 patent covered "concentrated" medium of sodium oxybate, and Hikma claimed it used a "diluted medium" in its application prior to application. In response to this non-infringement defense, Jazz promptly obtained two patents ('650 and '275) in September 2012 that purportedly covered these "diluted medium" applications. Jazz filed two separate patent infringement lawsuits based on these newly issued patents in October and December 2012.

128.    In 2:11-cv-00660, Hikma defended the claim concerning the '431 arguing that patent required sodium oxybate be added to an "aqueous medium," while Hikma did not add sodium oxybate to an "aqueous medium. In response, Jazz got a patent (the '203) where it claimed no addition of sodium oxybate was required, and sued Hikma in 2:15-cv-01360.

**I.      Jazz Reverses Course In Its REMS Negotiations, Discouraging Generic Entry**

129.    In yet another pivot, Jazz patented its REMS processes, even though it had already admitted that multiple pharmacies was just as safe as a single pharmacy set up.

130.    In a November 2011 investor conference, Cozadd said "We have nine patents covering the product, seven of which are in the Orange Book. Those patent dates go out to 2024. Five of the patents are around the restricted distribution system, although there are other patents for formulation and use. The restricted distribution system patents, we think, are particularly important because part of the FDA's approval in sodium oxybate back in 2002 was conditioned on having a very tight distribution system for this controlled substance, in part to ensure that there's not abuse or diversion." [40]

131.    The REMs patents were especially important, according to Cozadd: "We think any generic company — Roxane included — will have a difficult time setting up their own distribution system that … doesn't infringe our intellectual property." [41]

132.    The FDA has adopted Elements To Assure Safe Use exception ("ETASU") to waive certain burdensome barriers to entry. ETASU "provides safe access for patients to drugs with known serious risks that would otherwise be unavailable," if (i) the burden of forming a single shared system outweighs the benefits of having one; or (ii) an aspect of the REMS is covered by a patent or is a trade

---

[40] Jazz Pharmaceuticals Inc. Conference Call Transcript, Nov. 30, 2011;
https://investor.jazzpharma.com/node/12191/html.
[41] Id.

1   secret and the generic applicant certifies that it sought a license for use of that aspect and was unable to

2   obtain one. 21 U.S.C. § 355-1. ETASU introduced the threat that generic companies could get around

3   Jazz's REMS program.

4       **J.      Additional Paragraph IV Challengers Emerge and Face REMS Issues**

5       133.    In October 2012, Roxane sought Jazz's agreement to develop a single shared system

6   REMS.

7       134.    Amneal submitted an ANDA seeking FDA approval to market an AB-rated generic

8   version of Xyrem on December 10, 2012. Jazz sued Amneal after receiving its Paragraph IV notice

9   letter. After Amneal sent its initial Paragraph IV notice letter to Jazz, Jazz filed a patent infringement

10  action against Amneal. This initiated a series of ANDAs and Paragraph IV certifications, as shown

11  below:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| ANDA Applicant | Date of Paragraph IV Letter | Settlement | Terms |
|---|---|---|---|
| Amneal Pharmaceuticals, LLC | Dec. 10, 2012 | October 2018 | Jazz granted Amneal a right to sell a limited volume of an authorized generic version of Xyrem (for a term beginning July 1, 2023, or earlier under certain circumstances, and ending on December 31, 2025. Volume limited to "a low single digit percentage" of Xyrem sales volume. |
| Par Pharmaceutical, Inc. | Nov. 20, 2013 | January 2018 | Jazz granted Par a right to sell a limited volume of an authorized generic version of Xyrem (for a term beginning July 1, 2023, or earlier under certain circumstances, and ending on December 31, 2025. Volume limited to "a low single digit percentage" of Xyrem sales volume. |
| Ranbaxy Laboratories Limited and Ranbaxy Inc. | June 3, 2014 | May 9, 2016, | Ranbaxy gets a license to manufacture, market, and sell its generic version of Xyrem on or after December 31, 2025, |
| Watson Laboratories, Inc. | Oct. 29, 2014 | | |
| Wockhardt Bio AG | June 8, 2015 | April 28, 2016 | Wockhardt gets a license to manufacture, market, and sell its generic version of Xyrem on or after December 31, 2025, |
| Lupin Ltd. and Lupin Pharmaceuticals Inc. | July 23, 2015 | June 2018 | Jazz granted Lupin a right to sell a |

135.    Jazz knew that the FDA was likely to reject aspects of its REMS program as unduly restrictive. Jazz noted on September 30, 2013 in an SEC quarterly filing that ", "depending on the extent to which certain provisions of our Xyrem deemed REMS which are currently protected by our method of use patents covering the distribution of Xyrem are changed as part of updating our REMS documents, the ability of our existing patents to protect our Xyrem distribution system from generic competitors may be reduced."

136.    As shown above, by December 2013 Jazz faced Paragraph IV challenges from Amneal and Par. Around that time, the FDA informed Jazz that its single pharmacy distribution restriction would need to be modified. Jazz disclosed this in its SEC filings: "[W]e disagree with the FDA's current position that, as part of the current REMS process, the Xyrem deemed REMS should be modified to

1   enable the distribution of Xyrem through more than one pharmacy, or potentially through retail

2   pharmacies and wholesalers, as well as with certain modifications proposed by the FDA that would, in

3   the FDA's view, be sufficient to ensure that the REMS includes only those elements necessary to ensure

4   that the benefits of Xyrem outweigh its risks, and that would, in the FDA's view, reduce the burden on

5   the healthcare system. The FDA notified us that it would exercise its claimed authority to modify our

6   REMS and that it would finalize the REMS as modified by the FDA unless we initiated dispute

7   resolution procedures with respect to the modification of the Xyrem deemed REMS.  Given these

8   circumstances, we initiated dispute resolution procedures with the FDA at the end of February 2014.

9   We received the FDA's denial of our initial dispute resolution submission in the second quarter of 2014

10   and have submitted a request for further supervisory review to the next administrative level of the

11   FDA."[42]

12       137.   At the same time that it was resisting the FDA's efforts to modify the Xyrem REMS to

13   allow for multiple pharmacies, Jazz was obstructing ANDA applicants who were seeking to meet their

14   obligation to participate in a singled shared system REMS.

15       138.   Generic ANDA filers began to raise their concerns to the FDA, which was at the same

16   time dealing with Jazz's frivolous appeals of its actions concerning single-pharmacy REMS set up.

17       139.   In February 2015, the FDA approved Jazz's single-pharmacy plan but noted both Jazz's

18   inconsistent positions and the anticompetitive nature of Jazz's conduct: " the FDA has sought to finalize

19   and approve the REMS for Xyrem since 2008. In doing so, we have faced repeated, lengthy delays. The

20   REMS you submitted on November 7, 2014, which we are now approving, contains a requirement that

21   Xyrem be distributed only by a single pharmacy. Jazz's position that a single pharmacy is critical to the

22   safe use of Xyrem has not been a consistent one. In 2009, Jazz submitted a supplemental NDA for a

23   new indication for Xyrem for treatment of fibromyalgia in which it proposed to include multiple

24   certified pharmacies. However, by early 2011, after FDA declined to approve the fibromyalgia

25   indication, Jazz changed its position. By that time, Jazz had been granted several patents related to its

26   single pharmacy distribution system. In its 2013 SEC filings, Jazz noted that it expected FDA

27   ────────────────
[42] Jazz Pharmaceuticals Inc. June 30, 2014 10-Q at 8;
http://investor.jazzpharma.com/node/13961/html

28

1    modifications to the Xyrem REMS and stated that, 'depending on the extent to which certain provisions

2    of our Xyrem deemed REMS which are currently protected by our method of use patents covering the

3    distribution of Xyrem are changed as part of updating our REMS documents, the ability of our existing

4    patents to protect our Xyrem distribution system from generic competitors may be reduced.' This

5    statement, in conjunction with Jazz's change in position regarding the necessity of the single pharmacy

6    requirement, suggests Jazz's awareness that the Xyrem REMS could have the effect of blocking or

7    delaying approval of generic versions of Xyrem. Such an outcome would reflect the use of REMS to

8    block or delay generic competition in a manner inconsistent with section 505-1(f)(8). It would also place

9    an unjustified burden on patient access and on the healthcare delivery system."[43]

10       140.    Jazz promptly sought to take advantage of generic entrants by refusing to cooperate with

11   them and interfere with their ability to get FDA approval, causing the FDA to reverse course. "On

12   January 17, 2017, in response to generic manufacturer's allegations, the FDA waived the single-

13   pharmacy requirement for generic versions of Xyrem. In issuing this waiver, the FDA reiterated generic

14   manufacturer's allegations that 'Jazz ha[d] engaged in a strategy that 'entails serial attempts to impose

15   unreasonable contractual terms and conditions on the ANDA [filers] while concurrently issuing self-

16   serving statements to FDA and the ANDA [filers] about Jazz's commitment to the process.'"[44]

17       141.    "The FDA then found that the 'burden of creating a single, shared system outweighs the

18   benefits.' … Among the burdens were Jazz's 'obvious incentives' 'to delay generic competition [] by

19   failing to agree on [single, shared system] REMS terms." … The FDA thus concluded that allowing

20   ANDA applicants to proceed with their own drug distribution systems would 'remove a barrier to

21   generic products coming to market.'"[45]

22       **K.    The '730 Family Are Declared Invalid in Inter Partes Review.**

23       142.    Par and Amneal sought inter partes review ("IPR") before the PTAB of Jazz's '730

24   family of patents. Wockhardt and Ranbaxy also sought IPR.

25

26   _____

     [43] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/021196Orig1s015ltr.pdf
27   [44] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 11 (N.D. Cal. Aug. 13, 2021)
28   [45] *Id.*

1    143.    The '730, '106, '107, '059, '988, '182, and '936 patents were subject to IPR review starting

2 in January 2015.

3    144.    As noted above, on April 28, 2016, Jazz settled with Wockhardt and granted Wockhardt

4 a license to manufacture, market, and sell its generic version of Xyrem on or after December 31, 2025,

5 or "earlier depending on the occurrence of certain events" (the import of which is discussed below).

6    145.    Jazz settled with Ranbaxy next, granting it a license to manufacture, market, and sell its

7 generic version of Xyrem on or after December 31, 2025, or "earlier depending on the occurrence of

8 certain events" (the import of which is discussed below) on May 9, 2016.

9    146.    These settlements resolved Wockhardt and Ranbaxy's IPRs.

10    147.    Amneal and Par's IPRs were resolved in decisions by the PTAB from July 2016 to

11 March 2017, finding that "by a preponderance of the evidence" all claims of the '730, '106, '107, '059,

12 '182, '988 patents, and claims 24, 26, and 27 of the '963 patent, were unpatentable as obvious.

13    148.    The PTAB found that these claims, which related to Jazz's REMS program and

14 described a centralized database containing patient, physician, and prescription information, were

15 obvious because Orphan Medical had disclosed the program long before it filed the first patent

16 application (i.e., Orphan's disclosure at a publicly-held FDA Advisory Committee meeting on June 6,

17 2001) and such information was posted to the FDA's website.

18    149.    Jazz appealed the ruling to the Federal Circuit. In July 2018, the Federal Circuit affirmed

19 the PTAB invalidity rulings.

20    **L.    The Jazz-Hikma Reverse Payment Agreement**

21    150.    Hikma obtained final approval from the FDA for its AB-rated generic Xyrem product

22 pursuant to its ANDA on January 17, 2017.

23    151.    Hikma's trial with Jazz was set for July 2017. Hikma's prospects of brining a generic

24 product to market were bolstered by the FDA's decision to waive the single-pharmacy REMs

25 requirement, as noted above.

26    152.    Jazz publicly announced the settlement on April 5, 2017, in a Form 8-K: "In connection

27 with the settlement, Jazz has granted Hikma and its wholly owned subsidiary, West-Ward

28

Pharmaceuticals Corp. (West-Ward), the right to sell an authorized generic (AG) version of Xyrem in the U.S. under the Xyrem New Drug Application (NDA), commencing on January 1, 2023, or earlier under certain circumstances customary for settlement agreements of this nature. The AG product will be marketed through the Xyrem Risk Evaluation and Mitigation Strategy (REMS) program. The initial term of the AG arrangement is six months, and Hikma has the option to continue the sale of the AG product for up to a total of five years. Jazz will receive a meaningful royalty on net sales of the AG product, with the royalty rate increasing during the initial AG term based on increased AG sales. There will be a substantial increase in the royalty rate should the AG term be extended beyond one year. Jazz will also be paid for supply of the AG product and will be reimbursed for a portion of the service costs associated with the operation of the Xyrem REMS and distribution of the AG. Specific financial and other terms related to the AG product are confidential. Hikma has been granted a license to sell its generic sodium oxybate product under its ANDA at the end of the AG term."

153.    The settlement resolved litigation pending since 2010. Although some details of the settlement were public, many were kept secret. Jazz concealed the "no AG" agreement as well as the details of the licensing agreement.

154.    A "no AG" agreement was necessary because Hikma knew that even if it were successful at trial Jazz would have launched an authorized generic, undercutting the value of the victory.

155.    Taken together the Jazz-Hikma settlement had three reverse payments.

156.    "First, Jazz promised not to license AG to any third party other than Hikma between at least January 1, 2023 and July 1, 2023. Second, Jazz created a royalty structure of escalating payments from Hikma to Jazz that undermined Jazz's economic interest in marketing its own AG. … Third, the Jazz-Hikma agreement contained an 'acceleration clause.' … An acceleration clause is a type of most-favored-entry clause that allows a generic manufacturer to enter a market sooner if certain contingencies occur. ... In the Jazz-Hikma agreement, the acceleration clause allegedly allowed Hikma to immediately market Hikma Authorized Generic ('AG') if (1) a generic version of Xyrem were to market itself

without Jazz's permission; or (2) anyone were to successfully invalidate or render unenforceable Xyrem's unexpired patent claims."[46]

157. Acceleration agreements like this deter generic entry because it ensures generic entrants face competition if they enter the market, thereby making entry less valuable. See Keith M. Drake & Thomas G. McGuire, Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements, 16 J. Competition L. & Econ. 188, 188 (2020).

158. As noted above, and explained in further detail below, Jazz weaponized the acceleration clause in the Jazz-Hikma agreement against later generic challengers Par, Lupin, and Amneal.

159. Under the Jazz-Hikma Agreement, Jazz granted Hikma the right to sell an authorized generic version of Xyrem in the U.S. for an initial term of six months commencing on January 1, 2023 "or earlier under certain circumstances." Those circumstances include "the licensing or market entry of another generic sodium oxybate product, a final decision that all unexpired claims of the Xyrem patents are invalid and/or unenforceable, or a substantial reduction in Xyrem net sales over specified periods of time. We also granted [Hikma] a license to launch its own generic sodium oxybate product as early as six months after it has the right to sell the AG Product, unless it elects to continue to sell the AG Product, which it may do for up to a total of five years." Jazz Pharmaceuticals Inc. 2017 10-K at 5.

160. In return, Hikma agreed to pay Jazz "a meaningful royalty" on net sales of the AG, with the royalty rate increasing based on increased net sales of the authorized generic. The Jazz-Hikma the agreement had a royalty provision that operated to delay price competition. It "created a royalty structure that will charge Hikma a royalty rate that increases with Hikma's market share. This escalating royalty structure (1) disincentivizes output because 'market share' is defined in terms of unit volume (e.g., number of bottles); and (2) incentivizes higher prices because Jazz and Hikma can boost revenue while keeping volume low by raising prices"[47]

161. Although Hikma has a license to launch a generic product as of July 1, 2023, if it does so, Hikma will no longer have the right to sell an AG product through the Xyrem REMS.

---

[46] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 14 (N.D. Cal. Aug. 13, 2021)

[47] *Id.* at 49.

162.     Hikma agreed to purchase its supply from Jazz and distribute the AG through the Jazz REMS. According to Jazz's 2017 10-K, Jazz "will also receive payment for the supply of the [Hikma] AG Product and reimbursement for a portion of the services costs associated with the operation of the Xyrem REMS and distribution of the [Hikma AG Product."

163.     Jazz also granted Hikma a non-exclusive license under the Xyrem patents to make, have made, and market its generic sodium oxybate product under the Roxane ANDA in the U.S., which license was to be effective after the end of the AG sales period. Hikma agreed that it would not otherwise make, use, or sell a generic version of Xyrem for "so long as the Xyrem Patents remain in effect."

164.     Finally, under the guise of "attorneys' fees," Jazz made a cash payment to Hikma that was redacted from the 8-K: "Jazz shall make a one-time payment of [REDACTED] by wire transfer to an account designated by Roxane, in recognition of the savings inuring to Jazz in terms of the avoidance of costs and expenditure of time and resources associated with prosecuting the Actions." This cash payment was another reverse payment.

**M.     Jazz Enters Into Unlawful Reverse Payment Agreements With Par, Lupin, And Amneal: the Later Generic Defendants**

165.     In 2017 Ascent Pharmaceuticals, Inc. and Mallinckrodt submitted ANDA applications, in June and November. Jazz filed patent infringement actions against them in the U.S. District Court for the District of New Jersey.

166.     Ascent abandoned its challenge, and Jazz gave notice of dismissal of its action, 2:17-cv-05487, on August 29, 2017.

167.     Mallinckrodt abandoned its challenge, and Jazz gave notice of dismissal of its action, 2:18-cv-00029, on June 15, 2018.

168.     But generic challenges from Par, Lupin, and Amneal would continue.

169.     Jazz had entered into reverse payment agreements with Par, Lupin, and Amneal and that also had three reverse payments.

170.     "First, Jazz made multi-million-dollar cash payments to each Later Generic Defendant—

1   ostensibly for Jazz's avoided litigation costs. … Second, Jazz allegedly gave each Later Generic

2   Defendant a limited license to sell a constrained supply of AG. Each license (1) began only after the

3   expiration of Hikma's 180-day exclusivity period in July 2023; (2) was capped at a low-single-digit

4   market share; and (3) required a royalty payment, as a percentage of sales, that increased over time. …

5   Third, Jazz's agreements with each Later Generic Defendant contained acceleration clauses like the

6   acceleration clause in the Jazz-Hikma agreement discussed above. …" [48]

7       171.    In January 2018, Jazz granted Par a right to sell a limited volume of an authorized

8   generic version of Xyrem (the "Par AG") for a term beginning July 1, 2023, or earlier under certain

9   circumstances, and ending on December 31, 2025. This "Jazz-Par Agreement" further allocated the

10   market for the Xyrem AG by giving Par the ability to sell "a low single digit percentage" of Xyrem sales

11   volume during the calendar year preceding the entry date of the Par AG. In effect, Jazz simply agreed

12   to pay to Par a share of the supracompetitive profits it was gaining through the anticompetitive conditions

13   it had created.

14       172.    In June 2018, granted Lupin a right to sell a limited volume of an authorized generic

15   version of Xyrem (the "Lupin AG") for a term beginning July 1, 2023, or earlier under certain

16   circumstances, and ending on December 31, 2025. This  "Jazz-Lupin Agreement" further allocated the

17   market for the Xyrem AG by giving Lupin the ability to sell "a low single digit percentage" of Xyrem

18   sales volume.

19       173.    In October 2018, granted Amneal a right to sell a limited volume of an authorized

20   generic version of Xyrem (the "Amneal AG") for a term beginning July 1, 2023, or earlier under certain

21   circumstances, and ending on December 31, 2025. This  "Jazz-Amneal Agreement" further allocated the

22   market for Xyrem AG by giving Amneal the ability to sell "a low single digit percentage" of Xyrem sales

23   volume.

24       174.    In exchange for their respective share of Jazz's brand Xyrem revenue (via volume-

25   limited AG supply), Par, Lupin, and Amneal each agreed to abandon their challenge to Jazz's patents

26   and delay launch of their own AB-rated generic until December 31, 2025.

27   _____

28   [48] *Id.* at 15-16.

COMPLAINT
*Humana Inc. v. Jazz Pharms., Inc., et al.*
36

175.     Each of the Par, Lupin, and Amneal Agreements had cash payments that were suspicious under *Actavis* because they were "multi-million-dollar cash payments" "ostensibly for Jazz's avoided litigation costs."[49]

176.     With respect to the Par, Lupin, and Amenal Agreements, the use of fractionalized allocation was done to incentivize high prices for Xyrem. In the Agreements, "market share [is] defined by total units sold—again incentivizing higher prices because volumes were capped."[50]

177.     Each of Par, Lupin, and Amneal Agreements also included an "acceleration clause" that allows earlier entry if the Jazz patents were invalidated, another generic manufacturer entered the market, or there is a substantial reduction in Xyrem net sales over a specified period of time.

178.     Par, Lupin, and Amneal all made conscious decisions to restrict or block generic entry, throttle competition for Xyrem, and became part of the scheme to allocate the market for Xyrem.

179.     At the time of entering into the Jazz-Amneal Agreement, Amneal was aware of the arrangements between Jazz, Hikma, Lupin, and Amneal.

180.     As with the Jazz-Hikma Agreement, Jazz's agreements with Par, Lupin, and Amneal will not increase overall output, reduce price, or increase consumer choice; they will merely substitute Par, Lupin, and Amneal as the sellers of millions of dollars' worth of Xyrem for the sole purpose of paying them to delay market entry of less- expensive generic sodium oxybate, preserving Jazz's massive monopoly profits in exchange for doling out a small slice of them to Par, Lupin, and Amneal.

**N.     The Jazz-Hikma Agreement Has Caused, And Will Continue To Cause, Anticompetitive Effects**

181.     The Jazz-Hikma Agreement has numerous anticompetitive effects, most immediately that Hikma abandoned its patent challenge and could have entered the market after trial in July 2017 or shortly thereafter. Other generic entrants such as Par, Lupin, and Anmneal could have entered 180 days thereafter.

182.     Short of a litigation victory for Hikma, Jazz and Hikma could have, and would have absent their illegal agreement, settled for terms that did not include several illegal reverse payments.

---

[49] *Id.* at 42.
[50] *Id.* at 50.

1    183.    The same is true for Par, Lupin, and Amneal.

2    184.    Had these reverse payments not been reached, there would be agreed upon generic entry

3    prior to July 2023.

4    185.    The Jazz-Hikma agreement has an "implicit" "no AG" agreement. "As circumstantial

5    evidence of an implicit no-AG agreement, Plaintiffs rely on explicit parts of the Jazz-Hikma agreement.

6    These parts of the Jazz-Hikma agreement allegedly (1) disincentivize Jazz from marketing its own AG;

7    and (2) further compensate Hikma in order 'to maintain supracompetitive prices to be shared among

8    the patentee here, Jazz] and the challenger [here, Hikma] rather than face what might have been a

9    competitive market.'"[51]

10   186.    The Jazz-Hikma agreement has several poison pills that disincentivize Hikma from

11   entering the market with its own generic before July 2023. If Hikma enters, it would forfeit the ability

12   to use Jazz's REMS, cause Jazz to launch an AG, and after 180 days, other generic entrants would enter

13   and eat into Hikma's profits. Thus the Jazz-Hikma agreement locked up Hikma's ability to market its

14   own product.

15   187.    Jazz used the "acceleration clause" in the Jazz-Hikma Agreement to cause a roadblock to

16   Par, Lupin, and Amneal. The "acceleration clause" destroyed the value of any successful challenge

17   because victory would only mean that Hikma and Jazz, through an AG, would immediately compete. In

18   this way, the Par, Lupin, and Amneal Agreements allocated the market by ensuring the challengers

19   would take the payoff of high prices for their fractional share of Jazz's AG rather than seek to introduce

20   true generic competition.

21   188.    The royalty provisions in the Jazz-Hikma Agreement undermined price competition

22   because Hikma got a higher royalty rate if it increased its market share: "This escalating royalty structure

23   (1) disincentivizes output because 'market share' is defined in terms of unit volume (e.g., number of

24   bottles); and (2) incentivizes higher prices because Jazz and Hikma can boost revenue while keeping

25   volume low by raising prices."[52]

26

27   [51] *Id.* at 30-31 (quoting *Actavis*, 570 U.S. at 157)
28   [52] *Id.* at 49.

189.     The value of Jazz's revere payment to Hikma alone is at least $480 and as much as $705.[53] The logic of these estimate is that without having to contend with Hikma, Jazz could continue its price increases, and grow its sales steadily (as it had done before) from $1.5 billion in sales in 2018 until at least 2023. Had Hikma entered with a generic product, however, Jazz's profits would have been greatly reduced over the same period, as generic entry would have reduced the price of Xyrem immediately by as much as 50%, with 80% or more of the market going to the AB-rated generic.

190.     The fractional share of value to Par, Lupin, and Amneal is worth tens of millions of dollars. The math that explains Par, Lupin, and Amneal were each allocated tens of millions of dollars of value in their settlements with Jazz is as follows. Assuming $2 billion in annual sales, a modest projection from Jazz's 2020 brand revenues of $1.74 billion,[54] and that an authorized generic would be discounted by 10%, each 1% allocated to Par, Lupin, and Amneal would be worth $20 million.[55]

191.     Jazz touted the anticompetitive effects of the agreements. "At a conference on December 4, 2019, Jazz's CEO stated that 'in terms of dynamics on price, it's – th[e] [market] is not what you would think of as a generic free for all' because of the 'very limited volumes' for Par, Lupin, and Amneal. … Similarly, on November 14, 2018, a senior Jazz executive explained that 'after th[e] the 6-month exclusivity period for the first-filer [Hikma], 3 of the second filers [allegedly Par, Lupin, and Amneal] get to come again with a limited generic. And they are limited to low single-digit volume of the previous year Xyrem sales. So again, relatively low incursion on Xyrem here.'"[56]

192.     In November 2020 Jazz launched Xywav, a therapeutic equivalent of Xyrem. Jazz priced Xywav just below the price of Xyrem, in a further attempt to provide an obstacle for generic entry of Xyrem. Jazz hopes to convert the market for Xyrem to Xywav, such that when generic versions of Xyrem do eventually enter the market, the market will have shifted to Xywav.

---

[53] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 58-59 (N.D. Cal. Aug. 13, 2021)

[54] https://investor.jazzpharma.com/news-releases/news-release-details/jazz-pharmaceuticals-announces-full-year-and-fourth-quarter-2020#:~:text=Xyrem%20net%20product%20sales%20increased,the%20same%20periods%20in%2020 19.

[55] $2 billion x 90% x 1%

[56] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 11 (N.D. Cal. Aug. 13, 2021)

1    VI.    **DEFENDANTS' ANTICOMPETIVE EFFECTS IN THE MARKET FOR SODIUM OXYBATE**

2        193.    Jazz's conduct as described above harmed competition in at least several respects.

3        194.    First, Jazz's REMs process (and its manipulation of the FDA approved protocol in this

4    respect) initially required a single certified distributor and interfered with downstream competition on

5    price among competing distributors.

6        195.    Second, Jazz interfered with and refused to cooperate with generic drug companies that

7    sought FDA approval, creating a barrier to entry.

8        196.    Third, Jazz confounded generic entry by taking inconsistent positions with its REMs

9    programs, manipulating the statutory and regulatory mechanisms by which generic competition takes

10    place.

11        197.    Fourth, Jazz engaged in sham litigation, taking shifting positions in mushrooming

12    litigation in the District of New Jersey that caused years of recursive litigation.

13        198.    Fifth, entered into pay-for-delay agreements blocked and delayed generic entry, and

14    allocated the market for Xyrem and its AB-rated equivalents among Defendants.

15        199.    Jazz interfered with the normal operation of market conditions by throttling generic

16    entry through market allocation that was intended to, and would have the effect of, preventing full price

17    competition to Xyrem from AB-rated generic equivalents. This deprives consumers and Plaintiff of the

18    benefit of generic competition in the form of discounted AB-rated generic Xyrem. Jazz's scheme

19    prevented generic competition—which could have occurred as early as July 2017.

20        200.    There is no procompetitive justification or consumer benefit to Jazz's self-serving

21    scheme. Generic drugs offer enormous cost savings, which outweigh any non-pretextual, if there even

22    are any, justifications Jazz could possibly offer.

23    VII.    **JAZZ'S MONOPOLY POWER**

24        201.    Jazz has 100% of the share in the market for sodium oxybate.

25        202.    It has exercised its market power to exclude competition, and to raise the price of Xyrem

26    substantially without losing enough sales to make the price increases unprofitable.

27

28

1    203.    Jazz has serially and continually increased prices of Xyrem, as alleged above, generating

2    substantial profits.

3    204.    Only AB-rated generic Xyrem could take significant sales away from Xyrem. A small but

4    significant price increase in Xyrem would not cause Jazz to lose significant sales of Xyrem.

5    205.    Branded Xyrem has no significant cross-price elasticity with any other pharmaceutical

6    product, including any treatment for narcolepsy.

7    206.    There is no therapeutic substitute for Xyrem because other pharmaceutical products that

8    treat cataplexy and/or EDS are not therapeutically equivalent. Physicians typically prescribed Xyrem in

9    addition to other treatments for narcolepsy, such as amphetamines or wakefulness drugs. The fact that

10   Xyrem is not a therapeutic substitute for those other products is demonstrated by the fact that lower-

11   priced generic versions of those products were available during the conduct period, but those lower-

12   priced generic drugs did not take market share from Xyrem.

13   207.    Direct evidence of Jazz's market power includes the fact that AB-rated Xyrem would

14   have entered the market at a steep discount to Xyrem, and only AB-rated Xyrem could take significant

15   sales away from Xyrem.

16   208.    Direct evidence of market power also includes Jazz's gross margins on Xyrem (in excess

17   of 90%), and also that Jazz repeatedly and profitably raised prices of Xyrem.

18   209.    Further direct evidence is shown by the fact that Jazz never lowered the price of Xyrem

19   in response to competition from any other treatment or product.

20   210.    In the alternative, and to the extent Plaintiff must indirectly define a market, the relevant

21   product market is sodium oxybate—Xyrem, Xywav, and its AB-rated generic equivalents. The relevant

22   geographic market is the United States.

23   **VIII.   EFFECTS ON TRADE AND COMMERCE**

24   211.    The drugs at issue in this case are sold in interstate commerce. Defendants' unlawful

25   activities, as alleged above, have occurred in, and have had a substantial impact on, interstate commerce.

26

27

28

212.    At all material times, Xyrem, manufactured and sold by Jazz, was shipped across state lines and sold to customers outside its state of manufacture. Jazz directed the sale of Xyrem throughout the United States and into California.

213.    Defendants' unlawful activities, as described in this Complaint, affected both intrastate commerce in the states in which Plaintiff's health plans purchased Xyrem for their members, and interstate commerce flowing into or out from California.

214.    At all relevant times, Plaintiff was contractually responsible for the payments for the drugs at issue dispensed to Plaintiff's Insureds. Plaintiff entered agreements with PBMs, pursuant to which Plaintiff was, and is, responsible for paying for pharmaceutical drugs, including Xyrem, prescribed and dispensed to Plaintiff's Insureds throughout the United States.

215.    The anticompetitive acts by Defendants and their co-conspirators had, and continue to have, a direct, substantial, and reasonably foreseeable effect on California trade and commerce, including by artificially raising and fixing prices for the drugs at issue, as were paid in, and/or out from, California, and otherwise injuring corporations and persons located in California.

## IX.    ANTITRUST INJURY

216.    There is currently no AB-rated generic Xyrem on the market. Absent Defendants' conduct, there would have been one as early as January 2018.

217.    Plaintiff paid substantially inflated prices for Xyrem due to Defendants' scheme to frustrate and delay generic entry of AB-rated generic Xyrem.

218.    Price of Xyrem were artificially inflated, and price competition from AB-rated generic Xyrem was stopped dead.

219.    Defendants' scheme is the proximate cause of Plaintiff's injuries. But for Defendants' efforts to keep AB-rated generic Xyrem off the market, there would be substantially lower prices for Xyrem.

220.    Plaintiff would have substantial savings if the scripts for brand Xyrem were instead, as they would have been, scripts for AB-rated generic Xyrem. The absence of generic substitution and competition caused Plaintiff to pay overcharges for Xyrem that continue to the present.

1    221.    Plaintiff will present evidence of the overcharges it has paid in the form of econometric

2    analysis.

3    222.    Plaintiff suffered injury when it paid for prescriptions of Xyrem, at inflated prices, for

4    members located across the United States. Defendants' conduct had a substantial effect in Plaintiff's

5    business operations in these states because Plaintiff's health plans purchased Xyrem for members

6    located in these states.

7    223.    Antitrust injury is further shown by, as explained above, the "alleged reverse payments

8    are plausibly large and unexplained," and "the size of the unexplained reverse payment can provide a

9    workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration

10   of the validity of the patent itself."[57]

11   ## X.    PLAINTIFF'S CLAIMS ARE TIMELY

12   ### A.    Defendants Fraudulently Concealed by Omission Their Unlawful Agreements.

13   224.    Defendants fraudulently concealed the existence and the scope of the agreements alleged

14   here.

15   225.    The April 2017 Jazz-Hikma agreement was concealed from the public, as explained

16   above. Jazz and Hikma suppressed their tacit agreements, as well as the implied "no AG" agreement.

17   226.    The "implicit" "'no-AG' agreement is that Jazz will not sell an authorized generic of

18   Xyrem for 'at least the first six months that Hikma is eventually on the market' with the Hikma AG,

19   which is Jazz's Xyrem under the label of Hikma AG."[58] Although the agreements appeared to give Jazz

20   the ability to launch its own AG, these provisions were illusory: "Plaintiffs plausibly allege the existence

21   of an implicit or de facto no-AG agreement between Jazz and Hikma. As circumstantial evidence of an

22   implicit no-AG agreement, Plaintiffs rely on explicit parts of the Jazz-Hikma agreement. These parts of

23   the Jazz-Hikma agreement allegedly (1) disincentivize Jazz from marketing its own AG; and (2) further

24   compensate Hikma …. Plaintiffs specifically identify three parts of the Jazz-Hikma agreement that

25

26   [57] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 57 (N.D. Cal. Aug. 13,
27   2021) (quoting *Actavis*, 570 U.S. at 158).
     [58] *In re Xyrem Antitrust Litig.*, Case No. 5:20-md-02966-LHK, ECF No. 138, at 25 (N.D. Cal. Aug. 13,
28   2021).

1    disincentivize a Jazz AG and convey value to Hikma. The first is Jazz's promise not to license Jazz's AG

2    through any third party for six months. The second is the royalty structure, which escalates kickbacks

3    from Hikma to Jazz to undermine Jazz's economic interest in competing to sell Jazz's own AG. The

4    third is the Jazz-Hikma agreement's 'acceleration clause,' a type of most-favored-entry clause that allows

5    Hikma to sell AG immediately if (1) a generic version of Xyrem were to market itself without Jazz's

6    permission; or (2) anyone were to successfully invalidate or render unenforceable Xyrem's unexpired

7    patent claims." *Id.* at 30-31.

8        227.    The true state of affairs concerning the Jazz-Hikma agreement was concealed from

9    Plaintiff until the secret documents were disclosed in the briefing in the *Xyrem Antitrust* litigation motion

10   to dismiss.

11       228.    Accordingly, Plaintiff may recover damages reaching back beyond four years before the

12   filing of this Complaint.

13       229.    Plaintiff had no knowledge of the terms of Defendants' agreements and did know the

14   nature and extent of the scheme alleged. Nor could it have discovered the scheme and conspiracy

15   through the exercise of reasonable diligence more than four years before the filing of this Complaint.

16       230.    Defendants actively concealed the existence of their agreements and ongoing scheme.

17       **B.    Defendants' Continuing Violations.**

18       231.    Plaintiff alleges a scheme that is a continuing course of wrongdoing that includes actions

19   taken within the limitations period.

20       232.    Each time Plaintiff's health plans purchased brand or AB-rated generic Xyrem at an

21   inflated price, a claim accrued. Each such sale was an overt action taken by Defendants in furtherance of

22   the scheme alleged herein. A cause of action accrued to Plaintiff each time it paid an overcharge—i.e.,

23   each time it made a payment for Xyrem at a price higher than would have been paid absent Defendants'

24   unlawful conduct. Plaintiff began to pay overcharges as early as July 17, 2017.

25       233.    Plaintiff reserves the right to allege that it began to pay overcharges at an earlier time

26   based on evidence disclosed in discovery.  Jazz's agreements with Hikma have not been made public,

27   nor have the agreements with Par, Lupin, and Amneal.

28

1    XI.    **CLAIMS FOR RELIEF**

2                                    <u>**COUNT I**</u>

3    <u>**CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW**</u>

4                              (AGAINST JAZZ AND HIKMA)

5          234.    Plaintiff incorporates by reference the preceding allegations.

6          235.    Jazz and Hikma entered into an agreement or combination in restraint of trade in

7    violation of many states' laws. Jazz and Hikma engaged in a continuing contract, combination or

8    conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in

9    violation of the various state antitrust statutes set forth below.

10         236.    Jazz and Hikma entered into an unlawful reverse payment agreement that restrained, and

11   continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

12         237.    Jazz and Hikma's acts and combinations in furtherance of the conspiracy have caused

13   unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

14         238.    As a result of Jazz and Hikma's unlawful conduct, Plaintiff has been harmed by being

15   forced to pay artificially inflated, supracompetitive prices for Xyrem.

16         239.    In formulating and carrying out the alleged agreement, understanding, contract,

17   combination, and conspiracy, Jazz and Hikma did those things that they combined and conspired to do,

18   including but not limited to the acts, practices and course of conduct set forth herein.

19         240.    Jazz and Hikma's conspiracy had the following effects, among others: the reverse

20   payment agreement between Jazz and Hikma delayed generic entry and its attendant lower prices for

21   Plaintiff, and the market allocation output restriction agreement effectively fixed prices at an artificially

22   high level.

23         241.    Jazz and Hikma engaged in the actions described above for the purpose of carrying out

24   their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

25         242.    There was no legitimate, non-pretextual, pro-competitive business justification for this

26   reverse payment agreement that outweighs its harmful effect on Plaintiff and competition. Even if there

27   were some conceivable and cognizable justification, the payment was not necessary to achieve the

28

1   purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in

2   accordance with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

3       243.    By engaging the foregoing conduct, Jazz and Hikma intentionally and wrongfully

4   engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state

5   antitrust laws:

6           a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

7           b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

8           c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

9           d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

10          e) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

11          f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

12          g) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

13          h) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

14          i) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

15          j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

16          k)  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

17          l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in

18   Minnesota.

19          m) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

20          n) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

21          o) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

22          p) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

23          q) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

24          r) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

25          s) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

26          t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

27          u) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

28

1      v) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

2      w) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode.

3      x) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

4      y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

5      z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

6      aa) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

7      bb) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

8      244.    Plaintiff has been injured in their business or property by reason of Jazz and Hikma's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz and Hikma's unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz and Hikma's conduct unlawful.

      245.    Plaintiff seeks damages and multiple damages as permitted by law.

## COUNT II

## CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW

(AGAINST JAZZ AND AMNEAL)

      246.    Plaintiff incorporates by reference the preceding allegations.

      247.    Jazz and Amneal entered into an agreement or combination in restraint of trade in violation of many states' laws. Jazz and Amneal engaged in a continuing contract, combination, or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

      248.    Jazz and Amneal entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

      249.    Jazz and Amneal's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents

      250.    As a result of Jazz and Amneal's unlawful conduct Plaintiff has been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

251.     In formulating and carrying out the alleged agreement, understanding, contract, combination, and conspiracy, Jazz and Amneal did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

252.     Jazz and Amneal's conspiracy had the following effects, among others: the reverse payment agreement between Jazz and Amneal delayed generic entry and its attendant lower prices for Plaintiff, and the market allocation output restriction agreement effectively fixed prices at an artificially high level.

253.     Jazz and Amneal engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

254.     There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiff and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

255.     By engaging the foregoing conduct, Jazz and Amneal intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

e) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

g) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

h) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

i) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

m) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

n) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

o) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

p) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

q) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

r) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

s) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

u) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

w) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

aa) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

bb) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

256.    Plaintiff has been injured in their business or property by reason of Jazz and Amneal's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz and Amneal's unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz and Amneal's conduct unlawful.

257.    Plaintiff seeks damages and multiple damages as permitted by law.

**COUNT III**

**CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW**

(AGAINST JAZZ AND LUPIN)

258. Plaintiff incorporates by reference the preceding allegations.

259. Jazz and Lupin entered into an agreement or combination in restraint of trade in violation of many states' laws. Jazz and Lupin engaged in a continuing contract, combination, or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

260. Jazz and Lupin entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

261. Jazz and Lupin's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

262. As a result of Jazz and Lupin's unlawful conduct, Plaintiff has been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

263. In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Jazz and Lupin did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

264. Jazz and Lupin's conspiracy had the following effects, among others: the reverse payment agreement between Jazz and Lupin delayed generic entry and its attendant lower prices for Plaintiff, and the market allocation output restriction agreement effectively fixed prices at an artificially high level.

265. Jazz and Lupin engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

266. There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiff and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

267.    By engaging the foregoing conduct, Jazz and Lupin intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

e) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

g) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

h) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

i) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

m) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

n) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

o) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

p) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

q) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

r) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

s) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

u) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

w) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

aa) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

bb) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

268.     Plaintiff has been injured in their business or property by reason of Jazz and Lupin's violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for Jazz and Lupin's unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz and Lupin's conduct unlawful.

269.     Plaintiff seeks damages and multiple damages as permitted by law.

## COUNT IV

## CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW

(AGAINST JAZZ AND PAR)

270.     Plaintiff incorporates by reference the preceding allegations.

271.     Jazz and Par entered into an agreement or combination in restraint of trade in violation of many states' laws.  Jazz and Par engaged in a continuing contract, combination, or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

272.     Jazz and Par entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

273.     Jazz and Par's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

274.     As a result of Jazz and Par's unlawful conduct, Plaintiff has been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

275.     In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Jazz and Par did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

276.     Jazz and Par's conspiracy had the following effects, among others: the reverse payment agreement between Jazz and Par delayed generic entry and its attendant lower prices for Plaintiff, and the market allocation output restriction agreement effectively fixed prices at an artificially high level.

277.     Jazz and Par engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

278.     There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiff and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

279.     By engaging the foregoing conduct, Jazz and Par intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

e) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

g) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

h) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

i) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

1    l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in

2 Minnesota.

3    m) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

4    n) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

5    o) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

6    p) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

7    q) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

8    r) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

9    s) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

10   t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

11   u) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

12   v) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

13   w) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

14   x) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

15   y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

16   z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

17   aa) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

18   bb) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

19   280.   Plaintiff has been injured in their business or property by reason of Jazz and Par's

20 violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to

21 purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid

22 but for Jazz and Par's unlawful conduct. These injuries are of the type that the above laws were designed

23 to prevent and flow from that which makes Jazz and Par's conduct unlawful.

24   281.   Plaintiff seeks damages and multiple damages as permitted by law.

25                                **COUNT V**

26 **CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW**

27                          (AGAINST ALL DEFENDANTS)

28

282. Plaintiff incorporates by reference the preceding allegations.

283. Defendants entered into an agreement or combination in restraint of trade in violation of many states' laws. Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Xyrem in unreasonable restraint of trade and commerce, in violation of the various state antitrust statutes set forth below.

284. During the Relevant Period, Defendants entered into an unlawful reverse payment agreement that restrained, and continues to restrain, competition in the market for Xyrem and/or its AB-rated generic equivalents.

285. Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Xyrem and/or its AB-rated generic equivalents.

286. As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay artificially inflated, supracompetitive prices for Xyrem.

287. In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

288. Defendants' conspiracy had the following effects, among others:

a) It delayed and continues to delay generic entry of Xyrem in order to lengthen the period in which Jazz's brand Xyrem could and can monopolize the market and make supracompetitive profits;

b) It will keep an authorized generic from Jazz off the market during Hikma's 180-day generic exclusivity period, thereby allowing Hikma to monopolize the generic market for Xyrem during the period, and allowing Hikma to make supracompetitive profits;

c) It will, after Hikma's exclusivity period ends, continue to keep an authorized product from Jazz off the market as Amneal, Lupin, and Par enter with "very limited" quantities (throttled by Jazz) of generic Xyrem; and

d) It raised and maintained the prices that Plaintiff would and will pay for Xyrem at supracompetitive levels.

289.     From January 2023 until at least December 31, 2025, Jazz will share its monopoly power with Hikma, Amneal, Lupin, and Par, and the companies will jointly maintain an illegal monopoly throughout that time.

290.     Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of Xyrem.

291.     There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on Plaintiff and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations of the antitrust laws of various states in accordance with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

292.     By engaging the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Arizona Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c) C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4501, et seq., with respect to purchases in the District of Columbia.

e) Haw. Rev. Stat. §§ 480-1, et seq., with respect to purchases in Hawaii.

f) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

g) Iowa Code § 553.1, et seq., with respect to purchases in Iowa.

h) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

i) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine.

j) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in Minnesota.

m) Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

1       n) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to purchases in Nebraska.

2       o) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to purchases in Nevada.

3       p) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire.

4       q) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

5       r) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

6       s) N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina.

7       t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

8       u) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

9       v) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to purchases in Puerto Rico.

10       w) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

11       x) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to purchases in South Dakota.

12       y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

13       z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

14       aa) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

15       bb) Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

16       293.    Plaintiff has been injured in their business or property by reason of Defendants'

17 violations of the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to

18 purchase lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid

19 but for Defendants' unlawful conduct. These injuries are of the type that the above laws were designed

20 to prevent and flow from that which makes Defendants' conduct unlawful.

21       294.    Plaintiff seeks damages and multiple damages as permitted by law.

22<div align="center">**COUNT VI**</div>

23<div align="center">**MONOPOLIZATION AND MONOPOLISTIC SCHEME UNDER STATE LAW**</div>

24<div align="center">(AGAINST JAZZ)</div>

25       295.    Plaintiff incorporates by reference the preceding allegations.

26       296.    The relevant market is sodium oxybate (Xyrem, Xywav, and Xyrem's AB-rated generic

27 equivalents).

28

297.    As described above, before January 2023, Jazz has maintained and will maintain its monopoly power in the relevant market and, after that point, will share its monopoly power with Hikma first, followed by Amneal, Lupin, and Par, in an illegal monopoly.

298.    Jazz willfully and unlawfully engaged in continuing illegal conduct to monopolize the relevant market through at least December 31, 2025 by engaging in an anticompetitive scheme to keep AB-rated generic equivalents of Xyrem from the market—not as a result of providing a superior product, business acumen, or historical accident.

299.    Jazz knowingly and intentionally maintained and enhanced its monopoly power in the relevant market, as described herein, injuring Plaintiff. Jazz accomplished this scheme by:

a) Delaying generic entry of Xyrem in order to lengthen the period in which Jazz's brand Xyrem could monopolize the market and make supra- competitive profits;

b) Keeping an authorized generic off the market during Hikma's 180-day generic exclusivity period, and, subsequently when Amneal, Lupin, and Par are permitted to enter with only limited quantities of generic Xyrem, through at least December 31, 2025, thereby allowing Defendants to monopolize the generic market for Xyrem during the period, and allowing Defendants to make supracompetitive profits;

c) Raising and maintaining the prices so that Plaintiff would pay supracompetitive prices for Xyrem; and

d) Otherwise conspiring with the other Defendants to unlawfully monopolize the relevant market, including through the use of anticompetitive "acceleration" clauses.

300.    The goal, purpose, and effect of Jazz's scheme was also to maintain and extend its monopoly power with respect to Xyrem. Jazz's illegal scheme allowed it to continue charging supracompetitive prices for Xyrem, without a substantial loss of sales, reaping substantial unlawful monopoly profits. Jazz's scheme will allow Hikma to reap the benefits of reduced generic competition in the United States.

301.     There is and was no legitimate, non-pretextual, procompetitive justification for Jazz's conduct that outweighs its harmful effects. Even if there were some conceivable justification, the conduct is and was broader than necessary to achieve such a purpose.

302.     As a result of Jazz's illegal conduct, Plaintiff was compelled to pay (and did pay), and continues to be compelled to pay (and does pay), more than it would have paid for Xyrem and/or its generic Xyrem absent Defendants' unlawful conduct. But for Jazz's unlawful conduct, competitors would have begun selling generic Xyrem sooner, and prices paid for the drug or its generic equivalents, would therefore, be less.

303.     Had manufacturers of generic Xyrem entered the market and lawfully competed with Jazz (and one another) in a timely fashion, Plaintiff would have substituted lower-priced generic Xyrem for the higher-priced brand-name Xyrem for some or all of their Xyrem requirements, and/or would have paid lower net prices on their remaining Xyrem and generic Xyrem purchases.

304.     But for Jazz's illegal conduct, competitors would have begun marketing generic versions of Xyrem well before January 2023, and they would be able to market such versions successfully.

305.     By engaging in the foregoing conduct, Jazz intentionally, willfully, and wrongfully monopolized the relevant market in violation of the following state laws:

a) Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases in Arizona.

b) Cal. Bus. & Prof. Code §§ 16700, with respect to purchases in California.

c) C.G.S.A. §§ 35-27, et seq., with respect to purchases in Connecticut.

d) D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e) Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f) Haw. Rev. Stat. §§ 480-2, 480-9, et seq., with respect to purchases in Hawaii.

g) 740 Ill. Comp. Stat. 10/1, et seq., with respect to purchases in Illinois.

h) Iowa Code § 553.5, et seq., with respect to purchases in Iowa.

i) Kan. Stat. Ann. § 50-101, et seq., with respect to purchases in Kansas.

j) Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to purchases in Maryland.

1       l) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

2       m) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases in

3  Minnesota.

4       n)  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

5       o) Mo. Rev. Stat. §§ 407.020, et seq., with respect to purchases in Missouri.

6       p) Mont. Code Ann. §§ 30-14-101, et seq., with respect to purchases in Montana.

7       q) Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

8       r) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

9       s) N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to purchases in New Hampshire.

10       t) N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

11       u) N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases in New York.

12       v) N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

13       w) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota.

14       x) Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

15       y) P.R. Laws Ann. tit. 10, §§ 260, et seq., with respect to purchases in Puerto Rico.

16       z) R.I. Gen. Laws §§ 6-36-5 et seq., with respect to purchases in Rhode Island.

17       aa) S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

18       bb) Tenn. Code Ann §§ 47-25-101, et seq., with respect to purchases in Tennessee.

19       cc) Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

20       dd) Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

21       ee) W.Va. Code §§ 47-18-1, et seq., with respect to purchases in West Virginia.

22       ff) Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

23       306.    Plaintiff has been injured in their business or property by reason of Jazz's violations of

24  the laws set forth above, in that they were, and continue to be: (i) denied the opportunity to purchase

25  lower-priced generic Xyrem; and (ii) paid higher prices for Xyrem than they would have paid but for

26  Jazz's unlawful conduct. These injuries are of the type that the above laws were designed to prevent and

27  flow from that which makes Jazz's conduct unlawful.

28

307.   Plaintiff seeks damages and multiple damages as permitted by law.

**COUNT VII**

**FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION 16**

**OF THE CLAYTON ACT, 15 U.S.C. §§ 1-2, 26)**

(AGAINST ALL DEFENDANTS)

308.   Plaintiff incorporates by reference the preceding allegations.

309.   Plaintiff seeks declaratory and injunctive relief under state antitrust laws.

310.   As set forth above, Defendants have violated Section 16 of the Clayton Act, 15 U.S.C. § 26.

311.   Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations. This injury consists of paying higher prices for Xyrem than Plaintiff would have paid in the absence of those violations. These injuries will continue unless halted.

312.   Plaintiff, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, hereby seeks a declaratory judgment to correct the anticompetitive effects caused by Defendants' unlawful conduct and to restore competition in the market for Xyrem.

**COUNT VIII**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(AGAINST ALL DEFENDANTS)**

313.   Plaintiff incorporates by reference the preceding allegations.

314.   Defendants benefitted from monopoly profits on the sale of Xyrem resulting from the unlawful and inequitable acts alleged in this Complaint.

315.   Defendants' financial benefit resulting from its unlawful and inequitable acts is traceable to overpayments for Xyrem by Plaintiff.

316.   Plaintiff has conferred upon Defendants an economic benefit, profits from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff.

317.   It would be futile for Plaintiff to seek a remedy from any party with whom they have privity of contract with for its purchases of Xyrem.

318.     It would be futile for Plaintiff to seek to exhaust any remedy against immediate intermediary in the chain of distribution from which it indirectly purchased Xyrem, as they are not liable and would not compensate Plaintiff for unlawful conduct caused by Defendants.

319.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Xyrem is a direct and proximate result of Defendants' unlawful conduct.

320.     The economic benefits derived by Defendants rightfully belong to Plaintiff, as it paid anticompetitive and monopolistic prices between as early as July 17. 2017 and the present, benefiting Defendants.

321.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States for Defendants to be permitted to retain any of the overcharges for Xyrem derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint. Humana asserts claims under all such states' laws.

322.     Defendants are aware of and appreciates the benefits bestowed upon them by Plaintiff.

323.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff all unlawful or inequitable proceeds they received.

324.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff.

## XII.     DEMAND FOR JUDGMENT

325.     WHEREFORE, Plaintiff prays for judgment against Defendants and for the following relief:

A.     A declaration that the conduct alleged in this Complaint is in violation of the law, including each of the laws asserted in this Complaint;

B.     An award of Plaintiff's overcharge damages, in an amount to be proven and determined at trial, trebled as provided by law; with pre- and post-judgment interest at the statutory rates;

1    C.    An award to Plaintiff of equitable relief in the nature of disgorgement, restitution, and

2  the creation of a constructive trust to remedy Defendants' unjust enrichment;

3    D.    An award to Plaintiff of reasonable costs and expenses, including attorneys' fees; and

4    E.    An award of all other legal or equitable relief as the Court deems just and proper.

5  **XIII.  JURY DEMAND**

6    Plaintiff demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule

7  38(b).

8

9    DATED:   October 8, 2021        **SCHNEIDER WALLACE**
                                      **COTTRELL KONECKY LLP**
10

11                                    */s/ Todd M. Schneider*
                                      Todd M. Schneider (SBN 158253)
12                                    Jason H. Kim (SBN 220279)
                                      Matthew S. Weiler (SBN 236052)
13                                    2000 Powell Street
                                      Suite 1400
14                                    Emeryville, CA 94608
                                      (415) 421-7100
15                                    TSchneider@schneiderwallace.com
                                      JKim@schneiderwallace.com
16                                    MWeiler@schneiderwallace.com

17                                    **LOWEY DANNENBERG, P.C.**
18                                    Peter D. St. Phillip (*Pro hac vice* to be filed)
                                      Uriel Rabinovitz (*Pro hac vice* to be filed)
19                                    44 South Broadway, Suite 1100
                                      White Plains, NY 10601
20                                    (914) 997-0500
                                      PStPhillip@lowey.com
21                                    Urabinovtiz@lowey.com

22

23                                    *Counsel for Plaintiff*

24

25

26

27

28
                              COMPLAINT
                   *Humana Inc. v. Jazz Pharms., Inc., et al.*